## STATE v. HUTCHINGS.

No. 1694. Decided March 21, 1906 (84 Pac. 893).

1. BURGLARY—EVIDENCE—SUFFICIENCY.— In a prosecution for burglary, evidence *held* insufficient to support a conviction.[1]

2. CRIMINAL LAW—EVIDENCE—WEIGHT AND SUFFICIENCY.—It was incumbent on the jury to acquit the defendant, if the evidence relied on could be reconciled on any reasonable hypothesis consistent with the innocence of the defendant, especially where the evidence is wholly circumstantial, and there is no direct proof of the *corpus delicti*.

3. SAME—CONFESSIONS.—Evidence of an admission or confession by the accused in criminal case should be received and acted on with caution, especially where the evidence is conflicting.

APPEAL from District Court, Utah County; J. E. Booth, Judge.

Williard Hutchings was convicted of burglary, and appeals.

REVERSED.

*Booth & Cluff* for appellant.

*M. A. Breeden,* Attorney-General, for State.

---

[1] State v. Gordon, 28 Utah 15, 76 Pac. 882.

BARTCH, C. J.

The defendant was convicted of the crime of burglary and upon being sentenced to a term in the penitentiary, and a new trial having been refused, he appealed to this court.

The decisive question on this appeal is whether the evidence is sufficient to justify the conviction, and we are of the opinion that this must be answered in the negative. The appellant was charged with having burglarized a chicken house, the property of Karen Jensen, on the night of December 19, 1904. The evidence on the part of the prosecution shows, in substance, that the chicken house, the walls thereof made of rock and the roof of lumber, which contained three rooms, with a stove in the middle room, was located next to a hay barn; the door being so that one "could go out of the chicken house into the barn." The witness Mrs. Karen Jensen says the entrance door, leading in from the end next the hay, was on that evening fastened with a hasp. She says she retired about 9 o'clock and was awakened about 12 by a fire in the hay barn; that she found the door open, and no chickens in the chicken house; and that 'there had been "no fire made in the stove after half past 3 o'clock." She also said "there was hay in all three of the rooms. The next morning there were but two chickens left, and the bodies of two were found in the ruins. There is no direct proof to show that the defendant on that night was about the premises, but the witness Westphal testified that, between twelve and one o'clock, while on a different street from the one on which the premises are located, he saw the fire to the east about a mile distant, and, about seven minutes after first seeing it, he met two persons in a buggy of a peculiar shape going north and driving rapidly; that, after they had passed, he recognized one of them as the defendant; and that "it looked like they had a bundle of quilts in the buggy." On a former occasion, however, the witness testified: "Well, I can't say positive that it was him." The two men were driving a dark horse, while the defendant was accustomed to drive a light iron-gray horse. Several other witnesses saw those men driving the dark horse, but, it appears, none of

them recognized the defendant as one of the men, and one of the witnesses says he saw nothing unusual about the buggy while another says it had a "wobbly wheel." It is claimed those two men were seen driving toward the place of the alleged burglary about nine o'clock, and in the opposite direction about twelve o'clock on that night. Tracks of a light buggy were observed on the street and in the vicinity of the premises, in question, on the morning after the fire, and had the appearance of the wheels, on one side of the buggy, making different tracks, and there is some evidence tending to show such was the condition of defendant's buggy. There is also in the record an admission, testified to, against the objection of the defense, by the witness Barnett, sheriff, to the effect that the accused offered to plead guilty to petit larceny and pay for the chickens, if the charge of burglary were stricken out; but the defendant, in his testimony, positively denied this, and stated that such a proposition was made to him by the sheriff, and that he (defendant) refused to entertain it.

Against this evidence of the prosecution is the testimony of the defendant that on the 19th day of December, the day on which the alleged offense is charged to have been committed, he was at the home of his mother-in-law, Mrs. Ellen Ivers, where his wife was sick, and remained there from about nine o'clock in the morning until about twelve o'clock at night and the defendant's testimony in this regard is corroborated by that of his wife and four other credible witnesses, as appears from the record. There is also evidence of circumstances which tends strongly against the correctness of this conviction. As appears from the testimony already referred to, one of the witnesses stated that the two men whom he met driving, and one of whom he recognized as the defendant, had what appeared to be a bundle of quilts in the buggy. Now, if that testimony was intended to convey the idea that the chickens were concealed under the quilts, then, it would seem, common knowledge of such things would suggest the impossibility of so concealing and

30 Utah—21

carrying in a small buggy, like the one disclosed by the evidence, 116 chickens, for only 4 out of 120 were accounted for, without, if living, attracting attention by their noise, or, if dead, leaving stains of blood upon the vehicle; and yet no such noise appeared to attract the attention of the witness, while the vehicle was passing, and the sheriff, who, after the fire, made the examination of the defendant's buggy, testified: "I examined the inside of the buggy and found it was black and dirty. Mr. Hutchings said he had been hauling coal in it. When I examined the buggy I did not find any feathers and could not see any signs of blood." Nor is it shown that there were any signs of blood in the vicinity of the chicken house. Nor were the slumbers of the owner of the chickens disturbed by any noise of a vehicle or of chickens, or of parties prowling about the premises, although it seems that the burning of the fire in the barn did awaken her. Nor was any of the missing property found in the possession of the defendant. When the absence of all these things is considered, with the fact that the testimony, respecting the buggy, its tracks, and the two men driving the dark horse, discloses, outside of the alleged admission, all the material evidence and circumstances relating to the fire and disappearance of the chickens, upon which the prosecution relies to sustain the verdict, it certainly leaves the mind in very serious doubt, not only as to whether the offense charged was committed by the accused, but as to whether it was committed at all by any person.

Under the law it was incumbent upon the jury to acquit the defendant, if the evidence, relied upon, could be reconciled upon any reasonable hypothesis consistent with the innocence of the defendant. Especially is this rule applicable, where, as here it is sought to convict the accused wholly upon circumstantial evidence, and where the circumstances leave the mind in grave doubt as to the commission of the offense; there being no direct proof of the *corpus delicti*. That the fire and disappearance of the chickens and evidence relied upon to sustain the verdict can readily be explained upon a reasonable hypothesis consistent with the innocence of the

defendant seems clear, for it appears that the chicken house contained three rooms, with hay in each room and a stove in the middle room, in which fire was made as late as half past three o'clock in the afternoon of that day. Such being the case, it is not at all improbable that fire remained in the stove during the evening, and, through sparks, or some other way, ignited the hay, and that the chickens were consumed by the fire either in the chicken house or in the barn. By fright occasioned by the fire they may have been driven through the aperture of the door into the barn and then consumed, notwithstanding that the owner says she closed the door in the evening. She may be mistaken or the door may, in some way not accounted for, have become open. At all events, such a theory does not seem to be inconsistent with the evidence, but is suggested thereby, and is consistent with the alibi proved by the defense. It is also consistent with the previous good character of the accused, for it appears that he never was arrested for the commission of any offense, except the one here charged. So, it is consistent with the presumption of innocence which always continues as a shield to the accused, until he is proven guilty beyond a reasonable doubt. The only material thing which militates against the theory adverted to is the alleged verbal admission of the defendant, but the evidence respecting such an admission or confession in such a case should be received and acted upon with caution. Especially is this true where, as here, that evidence is conflicting. Motives which may have induced it, and the manner in which it was brought about, form proper subjects for consideration in determining the admissibility and weight of the evidence of it. This is true whether the statement of an accused amounts to a mere admission indicating guilt, or to a confession of guilt.

"With respect to all verbal admissions," says Mr. Greenleaf, in his work on Evidence (vol. 1, sec. 200), "it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by

unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. But where the admission is deliberately made and precisely identified, the evidence it affords is often of the most satisfactory nature."

Respecting confessions, the author, in the same volume (section 214), says:

"But here, also, as we have before remarked in regard to admissions, the evidence of verbal confessions of guilt is to be received with great caution. For, besides the danger of mistake from the misapprehension of witnesses, the misuse of words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is oppressed by the calamity of his situation, and that he is often influenced by motives of hope or fear to make an untrue confession. The zeal, too, which so generally prevails, to detect offenders, especially in cases of aggravated guilt and the strong disposition, in the persons engaged in the pursuit of evidence, to rely on slight grounds of suspicion, which are exaggerated into sufficient proof, together with the character of the persons necessarily called as witnesses in cases of secret and atrocious crime, all tend to impair the value of this kind of evidence, and sometimes lead to its rejection where, in civil actions, it would have been received."

Even if it had been admitted that the statement, attributed to the defendant, was made by him, still it would not have been entirely improbable that the circumstances prompted it —that the accused, if in fact innocent, felt himself so embarrassed, by his situation and surroundings, that, rather than run the risk of a conviction for a heinous crime, he would choose to plead guilty to petit larceny and pay for the property in question. Whatever may be the real facts in this case, the evidence in the record is not such as to warrant a conviction. In our judgment it is wholly insufficient to sustain the verdict. It is not even shown beyond a reasonable doubt that the crime charged was committed by any one. Under such circumstances as here disclosed, with no direct proof of the commission of the alleged offense, or of the guilt of the accused, a person cannot be deprived of his liberty. This case clearly falls within the principles adopted and declared in *State v. Gordon,* 28 Utah 15, 76 Pac. 882, where this court, speaking through Mr. Justice McCarty, held:

"Where there is an absolute lack of evidence to sustain a verdict in a criminal case, it is error to submit the case at all to the jury." (*State v. Seymour*, 7 Idaho 257, 548, 61 Pac. 1033, 1036.)

While we are of the opinion that evidence of an admission, like the one claimed to have been made by the defendant, is admissible, when offered in a proper manner and at a proper time, it, with the circumstances herein disclosed, cannot be regarded as sufficient proof to sustain the verdict.

The judgment must be reversed, and the cause remanded, with instructions to the court below to grant a new trial. It is so ordered.

McCARTY, J., concurs.    STRAUP, J., concurs in the judgment.