## STATE v. ROMEO et al.

No. 2353.  Decided September 3, 1912.  Rehearing Denied December 17, 1912 (128 Pac. 530).

1. CRIMINAL LAW—EVIDENCE—STATEMENT OF CO-CONSPIRATOR. In the trial of two parties for murder, the admission of evidence of a statement made by a third party already convicted for the same offense was not error, where the evidence showed that the statement was made within the hearing of both defendants, and the court instructed that it should not be considered against the defendants, unless made in their presence and hearing, or acquiesced in by them. (Page 56.)

2. CRIMINAL LAW—HARMLESS ERROR—ADMISSION OF EVIDENCE. The improper admission of a false statement by one jointly charged with the defendants, but separately tried, as to where he was at the time of the homicide, is harmless where there is no controversy as to where he was at such time. (Page 57.)

3. CRIMINAL LAW—APPEAL—OBJECTION BELOW—EVIDENCE. In the absence of an objection or request to restrict the application of testimony admissible only against one of two defendants jointly tried for murder, error cannot be predicated upon its admission. (Page 57.)

4. CRIMINAL LAW—INSTRUCTION—CONFESSIONS. Though the evidence was conflicting as to whether the defendants understood the full purport of their confessions, the court properly refused to instruct where their confessions were in evidence, that confessions are a doubtful species of evidence, and are rarely sufficient to warrant a conviction, and that, when freely made, they are the weakest of all testimony, and seldom remembered with due precision; such charge being argumentative and invading the province of the jury as to the weight of evidence. (Page 58.)

5. CRIMINAL LAW—EVIDENCE—CONFESSIONS. Confessions and admissions, when made deliberately and voluntarily, and precisely understood, and correctly remembered and related, constitute evidence of the most satisfactory character.[1] (Page 59.)

6. CRIMINAL LAW—EVIDENCE—SELF-SERVING STATEMENTS. The self-serving part of an entire statement admitted in evidence should be duly considered and weighed with the unfavorable part, but all parts of the statement are not necessarily to be regarded as worthy of equal credit. (Page 61.)

---

[1] State v. Hutchings, 30 Utah, 323, 84 Pac. 893.

7. CRIMINAL LAW—INSTRUCTION. In the joint trial of two defendants for murder, an instruction requested by one defendant who claimed he was not actually present "that while one who aids, abets or assists another in the execution of the commission of any crime, yet mere presence or even acquiescence is not alone sufficient to charge one as an accessory, before one can be held guilty as an accessory, some affirmative acts or conduct must be proved beyond a reasonable doubt," being incomplete and ambiguous, was properly refused. (Page 62.)

8. CRIMINAL LAW—INSTRUCTION—CODEFENDANTS. The rights of such defendants were sufficiently guarded by an instruction that, if one defendant killed the deceased as an independent act, the other defendant could not be held for the killing, unless he advised, aided, abetted, assisted, or encouraged the one who did the act. (Page 62.)

9. CRIMINAL LAW—INSTRUCTION—PRESUMPTION OF INNOCENCE. It was improper to instruct that the presumption of innocence is not intended to aid any one who is in fact guilty to escape, but is a humane provision intended to guard against the danger of an innocent person being unjustly punished; its effect being to indicate the court's belief in the defendant's guilt, and fear of an acquittal. (Page 63.)

10. CRIMINAL LAW—HARMLESS ERROR—INSTRUCTION. Such instruction was harmless, however, where the court correctly charged on the presumption of innocence and burden of proof, and it appeared that the result would have been the same had the erroneous portion of the charge not been given. (Page 63.)

11. CRIMINAL LAW—INSTRUCTION—CIRCUMSTANTIAL EVIDENCE. An instruction which enlarged upon the proposition that circumstantial evidence is competent, and in many cases quite as conclusive in its convincing power as direct and positive evidence, though it unduly emphasizes the probative effect of such evidence, was harmless, where from the whole charge the jury could not have been misled, and there was direct evidence to show both the commission of the offense and the defendants' connection therewith. (Page 65.)

12. CRIMINAL LAW—INSTRUCTIONS—CIRCUMSTANTIAL EVIDENCE. When all of the evidence is circumstantial, the court should charge the rules applicable to that kind of evidence.[2] (Page 66.)

13. CRIMINAL LAW—INSTRUCTION—PENALTY. In a homicide case it was error to instruct that, if there are "circumstances in the

[2] People v. Scott, 10 Utah, 217, 37 Pac. 335; State v. Brown, 29 Utah, 140, 115 Pac. 996.

case which to the minds of the jury would justify a recommendation" that the defendants be imprisoned for life in case of a verdict of murder in the first degree, the jury can make such recommendation; the discretion of the jury in making or withholding a recommendation being an absolute power to be exercised by them without direction from the court as to the reasons that shall govern them. (Page 66.)

14. CRIMINAL LAW—HARMLESS ERROR—INSTRUCTION. Such instruction was harmless, however, though it was calculated to convey the idea that a recommendation of life imprisonment would be justified only upon sufficient circumstances, where it appeared that a charge with the objectionable features eliminated would not have produced a different result.[3] (Page 66.)

15. CRIMINAL LAW—HARMLESS ERROR—VERDICT. Failure of the court in a homicide case in giving the forms of verdict to the jury to give a form recommending life imprisonment in case of a verdict of murder in the first degree was harmless, where the court instructed and explained that the jury had a right to make such recommendation. (Page 68.)

APPEAL from District Court, Seventh District; *Hon. A. H. Christensen,* Judge.

Frank Romeo and two others were convicted of murder in the first degree. They appeal.

AFFIRMED.

*W. H. Frye, C. C. McWhinney* and *Booth, Lee, Badger, Rick & Parke* for appellants.

*A. R. Barnes,* Attorney-General, *E. V. Higgins,* and *Geo. C. Buckle,* Assistant Attorneys-General, for the State.

STRAUP, J.

The three defendants were jointly charged with first-degree murder, the homicide of Albert Jenkins at Sunnyside, on the 5th day of February, 1911. Corier was first tried, found guilty, and sentenced to life imprisonment in the state prison. Thereafter Romeo and Zaffy were tried together.

---

[3] State v. Riley, 41 Utah, 225, 126 Pac. 294.

Both were convicted and sentenced to suffer death. Both appeal.

The questions for review relate to the admission of certain testimony, the court's refusal to charge as requested by the defendants, and portions of the charge. We shall refer only to so much of the evidence as is necessary to properly review them.

Corier was a baker at Sunnyside. At that place Jenkins, the deceased, and one Bentley conducted a gambling business. Romeo and Zaffy were in Salt Lake City out of employment. A countryman of theirs informed them that work could probably be procured at Sunnyside, and wrote to Corier about it. Corier sent tickets to Salt Lake for the defendants' transportation to Sunnyside. They arrived there on the evening of the 3d of February, and were met at the train by Corier. He gave them supper, and money for a night's lodging. The next day Corier quit his employment, and was paid off. On the morning of the 4th Romeo and Zaffy visited and drank at saloons, and later went to coke ovens at Sunnyside. There, in the afternoon, they were joined by Corier. They remained there until late at night, and drank much whisky. In the early morning of the 5th, between 12:30 and 1 o'clock, the deceased was robbed and killed as he and Bentley were on their way home from their place of business. Bentley, a witness for the state, testified that he and Jenkins left the saloon, where they conducted a gambling business, at about 12:30 o'clock a. m. to go to Bentley's house, about a hundred yards away, and followed a path or trail leading from the saloon to the house. Jenkins in his coat pocket carried a sack containing $282 in silver. He also had $130 in gold in a purse. He carried a black handled double-action revolver in his waistband. As they approached a toilet along the path, three men, two of whom at least had guns, suddenly stepped out from behind the toilet and fired, first at Jenkins, and then at Bentley. Bentley ran and fell to the ground "as if I was hit, and laid there with my back toward Jenkins. I heard their footsteps shuf-

42 Utah 4

fling around and their mutterings as they advanced on Jenkins. I heard ten or more shots. I heard Jenkins say, 'Take the money, but don't murder me. Here is the money, take it; don't murder me.' Then the shots ceased for a little while, about time enough to get the money, and then there were three or four more shots fired. As I lay there and thought they were all gone, and as I was ready to get up, I heard footsteps coming behind me, and I laid there like I was dead. He (the person coming up) took hold of me with one hand and with the other fired a shot and struck me here (indicating about the abdomen), and it went through my coat and clothing." The bullet was deflected by striking a book in his pocket and abraded the skin about the abdomen. The bullet was later found in his clothes. After the assailants had departed Jenkins called for help. Bentley and others assisted him to the house. He had one gunshot wound in the arm and one "in the region of the naval," which caused his death two or three hours later. He also had a deep and rather long wound or cut in the neck made by a sharp instrument. His clothing bore bullet marks and cuts. There were several fresh bullet marks in the toilet, and some in a house along the path. Bentley was unable to identify either of the defendants.

Another witness, attracted by the shooting, heard the deceased cry out, "Take the money, but don't murder me." He saw two men run from the place where the shooting occurred, and shortly thereafter a third. He recognized the third as the defendant Corier. A slight snow, two or three inches, had fallen earlier in the night. Three distinct foot tracks were discovered about the toilet and its vicinity. They were traced from there to the railroad track and across the country in the direction the assailants went. The tracks, beyond dispute and all doubt, were those of the three defendants. The assailants were pursued by officers and a posse. Zaffy and Corier were apprehended and arrested the next day about twenty miles from Sunnyside; Romeo the day after still farther away, at Green River. Romeo had in his possession a loaded white handled revolver, eight additional cartridges,

a razor with blood on it, and a sack containing $85.50 in silver. The sack was identified as that carried by Jenkins and taken from him. Zaffy had $4.50 or $5.50, and Corier about $35 or $37. Neither Corier nor Zaffy had weapons when they were arrested. Each of the defendants freely and voluntarily made statements to the officers and others as to their connection with the transaction. Zaffy told them that he met Romeo in Salt Lake about two weeks before they went to Sunnyside. They were out of work, and Romeo proposed that they go to Sunnyside. Romeo told him he would furnish tickets if he would go with him. A few days later they received tickets and went to Helper, and then to Sunnyside, where they were met at the train by Corier. He gave them supper and Romeo five dollars to pay for their lodging and breakfast. The next morning Zaffy and Romeo visited saloons, and had several drinks. They then went over in the brush near the coke ovens, and remained there until in the afternoon, when they were joined by Corier, who brought with him two bottles of whisky. They remained there drinking the whisky until about eight o'clock in the evening. They then went to the Italian saloon, where Romeo bought a half gallon of whisky. They took it, and "went up to the cedars," and remained there until late at night, drinking whisky. While drinking in the brush near the ovens, "they made up this plan to hold up two gamblers that was over there at that saloon where they had drank that morning." Zaffy did not want to go, but was afraid of Romeo, who, he said, was "a black-hand man." Romeo and Corier gave him more whisky, and he got pretty drunk. The three men went over where the gamblers lived, and hid in the water-closet. The two men came along there, and they all ran out and there was lots of shooting. He had no gun and did no shooting. He saw the two men do a little shooting, but saw no money and no gun, except he saw "Romeo have a white handled gun sticking in his belt as they were running through the cedars after the shooting." He said he was so drunk when the shooting occurred that he did not clearly remember what all took place, and that

he was not able to help himself. He fell down, and his companions helped him up to get away. The three remained together until they reached Cedar Station. There they were pursued and shot at by officers. They separated, Zaffy and Corier remaining together, continuing their flight until their arrest.

Romeo told the officers and others that Zaffy and Corier had not treated him right, and he, too, wanted to make a statement. He told them about getting the tickets and going to Sunnyside, meeting Corier, drinking whisky, substantially as related by Zaffy; that while he and Zaffy were in the brush near the ovens Corier "came over with some whisky, and that they drank, and that Corier proposed that they hold up them two gamblers, that they had all kinds of money, and that he told Corier that he did not want to do that, and that Corier then gave him more whisky, and that he got a little drunk, and Corier handed him the gun that was taken from him at Green River, and that Corier had an automatic gun. They went to the station saloon, bought more whisky, drank most of it, and then all three went up the path behind the water-closet and waited for these two men to come from the saloon, and, when they came along, all three rushed out, and that Corier did the shooting, but that he, Romeo, did not shoot; that Corier took the sack of money from Jenkins, and carried it until they got near Cedar Station. There they divided the money, Corier giving Romeo four twenty dollars in silver and Zaffy four twenty dollars in silver. Corier putting his share in his pocket, and giving the sack to Romeo to carry his."

Corier's version of the affair as told the officers is this: Romeo and Zaffy came to his bakeshop. He gave them something to eat, and gave Romeo five dollars to pay for their lodging at the Italian hotel. Corier intended to leave Sunnyside on the 4th and go to Salt Lake, there to work at his trade, and for that reason quit his employment at Sunnyside. That "he started to catch the train, and on his way met Romeo and Zaffy at the coke ovens. They told him that they were going to hold up Jenkins and get all his money,

and insisted on his staying with them. He told them that he did not desire to make his money that way, and then they drank, and he got pretty drunk, and he was afraid to separate from them, especially from Romeo, who was a 'black-hand man,' a bad man. That night they waited behind the buildings and the closet, and, when Jenkins came along he, Corier, was too drunk to go out, but Romeo went out, and he heard some one shooting. He, Corier, had no gun, and did not shoot and took nothing from Jenkins, and received no part of the money."

At the trial all three of the defendants denied making the statements with respect to the affray, robbery, and plan to rob. Romeo testified that he and Zaffy left Salt Lake and went to Sunnyside, there met Corier, and that they were up in the brush near the coke ovens as heretofore stated; that "about seven or eight o'clock he and Corier got a half gallon of whisky and drank it, and then they started to go to the lower saloon. We took the wagon road. I went to the closet. Zaffy and Corier kept on down the road to the saloon. When I stepped out of the closet, two men stepped in front of me, and one says, 'You ———, what are you doing there?' The one in front shot me. I took out my razor, and went at them. The razor taken from me is the one that I used. They shot me two or three times. I took my razor, and cut him one below the ear. I took the revolver away from him, and shot him with his own gun. I threw him down, and cut him once, and shot him with his own gun. The first man shot at me twice or three times and the other one shot. I ran. They were firing shots at me. The gun found on me and taken from me is the gun I took from the deceased, and with which I shot him. I took the sack of silver from the deceased at the same time I took the gun, but thought the sack was arms. Corier and Zaffy were not at the closet at the time of the shooting. They were down the road. I overtook them, and said, 'Let's go to the main line.' I took no money out of the sack, and gave none to either Corier or Zaffy. The sack found on me was the sack I took from

the deceased. I did not show the gun, or razor, or sack to Corier or Zaffy. I did not tell them I had any trouble. I was drunk, and did not say anything." On cross-examination he testified that "when they (the deceased and his companions) shot, I went right towards them. They both had guns. I made for them to save my life. They were shooting me like a dog, so I did not run. While I was doing this, the other fellow was a little distance away from me. I did not throw the man down and cut him. I shot him two or three times with his own gun. I was awfully drunk. I did not say a word about it to Corier or Zaffy."

Zaffy, after testifying about going to Sunnyside with Romeo, testified that, while he and Romeo were at the coke ovens, Corier, about three or four o'clock in the afternoon, came along, and said he had missed his train and stayed with them. He had two pints of whisky. "We drank it and stayed there until dark. Then Romeo went after a half gallon of whisky and fetched it over, and we pretty near drank that. We left there and went down town. I was drunk then. Corier said, 'We'll go down town, and have a few more drinks at the lower saloon.' Before we got there Romeo said, 'I am going to the toilet.' He left us. Pretty soon I heard this shooting going on. I kind of stopped, and pretty soon Romeo came running and excited, and he says, 'Let's get out of here; let's go to the main line.' Corier and I were drunk, and we went with him. When Corier left us to go to the closet, he was out of sight, and we could not see what he did. The shots were pretty quick like after he left us. He joined us in a couple or three minutes. He was running when he came. I was not present when Romeo did the shooting, and wasn't in sight of anybody shooting. I didn't know who did the shooting. I had no weapon of any kind, and Corier had none so far as I know. I didn't see any gun on Romeo before the shooting, but saw a gun on him after the shooting. I did not see any money on either Romeo or Corier, and received none from either. There was none divided between us. I don't know how many shots were fired. I don't know whether Romeo had anything in

his hands when he returned. He was excited. I did not ask him any questions. He did not tell me anything. I didn't ask any questions as to where he was going, nor did I inquire as to what the trouble was. I kind of suspicioned Romeo. I was suspicious about hearing that shooting, and thought there was something wrong the next day. I know Romeo pretty well, and chummed with him at Salt Lake. I did not know that he was a blackhander, and I was not afraid of him. When Romeo said, 'Let's go to the main line,' I did not know what he meant, and I did not know where he was going. I was drunk and went. Had I been sober, I would have stayed."

Corier, after testifying that he had sent the tickets to Romeo and Zaffy to come to Sunnyside, and provided them with money for lodging, testified that the next day he quit his employment, and was paid thirty-five dollars in silver, gold and currency. Then he "went down to the saloon to pay a beer debt and told the gambler and bartender that he was going to Salt Lake to work," and each gave him a bottle of whisky. He then went up to the coke ovens to catch his train, but missed it, and there found Romeo and Zaffy warming themselves by the ovens. There they drank the whisky, and later got a half gallon more, and drank it. They were all pretty drunk. Late at night they all left to go to the saloon for another drink. On their way Romeo said he wanted to go to the closet. He left them, and Corier and Zaffy walked on down the road. He did not hear any noise or shooting. He was too drunk. Later he heard Romeo say to Zaffy, "Let's go to the main line." Corier said: "If you fellows are going to the main line, I will go because I want to go to Helper." It was dark, and he didn't remember where they went. He had no gun, and did not see any gun on Zaffy. He did not do any shooting and did not know of any trouble, nor anything happening at Sunnyside. He took no money from the deceased, and none was divided among the three men, and did not know that the deceased or anyone had been shot or robbed until after the defendants had been arrested and accused.

Bentley, on rebuttal, testified that the gun carried by the deceased on the night of the homicide was a dark and not a white handled gun, and that the gun taken from Romeo was not the deceased's gun, and was not the one carried by him that night; that neither he nor the deceased said anything before the assailants shot them; and that he, Bentley, had no weapon, and did no shooting; and that the deceased did not shoot before, but may have shot after, Bentley fell to the ground, and lay with his back towards the deceased.

The jury evidently did not believe the defendants' testimony as to the shooting in self-defense, nor their version of the affair as testified to by them on the trial, but necessarily found that the defendants shot and killed the deceased on a previously arranged plan to rob him, and that both defendants either directly participated in the transaction, or aided and abetted in and encouraged the commission of the offense.

One question relates to this: A witness for the state, a constable at Sunnyside, testified that he on a railroad velocipede met the defendants on the railroad track near Woodside the day after the homicide, and spoke to Corier; that Romeo was behind Corier about thirty or forty feet, and Zaffy about seven feet to his side. The witness was asked if Romeo was in hearing distance. He answered that he was. Then he was asked what he said to Corier, and what reply he made. This was objected to. The objection was overruled. The witness answered that he asked Corier where he had been, and that Corier replied, "At Hiawatha." It is urged that as this was a trial of Romeo and Zaffy, and not of Corier, and as the transaction of the homicide was wholly ended, the statements of Corier were inadmissible, unless shown to have been made in the presence and within the hearing of Zaffy and Romeo, which, it is argued, was not sufficiently shown. What was said by the witness and Corier certainly was in the presence and hearing of Zaffy. The witness testified that it was also within the hearing of Romeo, though he was thirty or forty feet away. We think sufficient facts were shown to justify a finding that what was said was within the hearing of both

Zaffy and Romeo. Furthermore, the rights of the defendants in this particular were fully protected in the charge. The court charged:

"You should not consider any statement made by John Corier after the killing of Albert Jenkins, if you find that any such were made, and not in the presence and hearing of said defendants nor acquiesced in by them, as any evidence against them, but they must be considered only as above stated in bearing upon the credibility of said John Corier and the weight to be given to his testimony."

True, this portion of the charge was in connection with and related to the confessions or admissions made by Corier to the officers heretofore referred to.

But it equally applied to any other statements made by Corier after the homicide, and not in the presence or hearing of the other two defendants. Again, we think the matter of but little importance, Corier's answer is said to be harmful because he did not speak the truth. He had not been at Hiawatha. But there is no dispute or controversy as to where the defendants were at the time of the homicide. Romeo testified that he shot the deceased; Zaffy, that he then was at Sunnyside and near the place of the shooting, and was with Romeo immediately before and after it occurred. But, aside from this, we think the evidence was properly received.

This witness also testified that, when he met the three defendants on the track, "Romeo, when he was coming around the curve, he was behind these other two fellows when I spoke to them and so Romeo stopped and threw his hand like that (indicating to the hip); that is the way he held his hand until he went by me." It is urged that this was inadmissible as against Zaffy. But no objection was made to it, and no exception taken. It was admissible as against Romeo. If the act was not in the presence or observation of Zaffy, and not countenanced by him, he ought to have requested the court to restrict the consideration of this testimony as against Romeo alone. No such request was made. Under such circumstances, error

cannot be imputed to the court in receiving the testimony, for it was clearly admissible as against Romeo.

The confessions or admissions of both defendants made to the officers and others heretofore referred to were put in evidence by the state as separate admissions against each and as binding only on each. The confession or admission of Corier, who was a witness for the defendants, was put in evidence by the state in rebuttal to impeach his testimony. The court directed the jury that the confessions or admissions of Romeo, if they found he made any, could be considered as evidence only against Romeo but not against Zaffy, and that of Zaffy only against him, and not against Romeo, and that the confession or admission of Corier, not in the presence or hearing of Romeo or Zaffy, could only be considered by the jury in determining the credibility of Corier, and the weight to be given his testimony. In addition to this the defendants requested the court to charge:

"No. 12. The court instructs the jury that confessions of prisoners out of court are a doubtful species of evidence and should be acted upon by the jury with great caution, and, unless they are supported by some other evidence tending to show that the prisoner committed the crime, they are rarely sufficient to warrant a conviction.

"No. 13. You are instructed that extrajudicial confessions, when freely made, are the weakest and most suspicious of all testimony, ever liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accurately or reported with due precision, and incapable in their nature of being disproved by other negative evidence. Verbal admissions of a person on trial charged with a crime should be received with great caution, as that kind of evidence is subject to imperfection and mistake."

These requests were refused.

It is urged that where evidence with respect to facts involved in oral confessions or admissions, or with respect to material parts of the confession or admission itself, is in conflict, it is the duty of the court, when requested, to admonish

the jury to receive and act with caution upon the testimony
showing such confessions or admissions. In support of this
we are referred to *State v. Hutchings,* 30 Utah, 323, 84 Pac.
893; 1 Greenl. Ev., secs. 200, 214; Jones Ev. sec. 295, and
to other cases. These authorities state the rule that
oral admissions and confessions should be received
with caution and viewed with scrutiny because of the
liability to err in understanding, remembering, and relating
statements and conversations, the opportunity to add to or
omit portions of them, the common tendency for one often
to misspeak himself or not fully or accurately to express his
real intention, and because such evidence is otherwise often
subject to imperfection and mistake. These authorities, how-
ever, also assert the rule that admissions and confessions,
when deliberately and freely made, and when precisely un-
derstood, remembered and reported, constitute evidence of
the most satisfactory nature. These rules, of course, are
well settled. Let it be conceded that the court, under the
circumstances stated, owes a duty to charge on the subject.
That is shown by some of the cited authorities, especially
*Haynes v. State* (Miss.), 27 South. 601. Let it also be con-
ceded that there was here evidence to render a charge on the
subject applicable, the evidence being in conflict as to what
was in fact said by the defendants, and some evidence to show
that they did not speak the English language distinctly or
understandingly, and that they spoke it with some confusion
and difficulty. There, however, is no claim made that the
admissions or confessions were not deliberate or voluntary, or
that they were in any manner induced or influenced. The
defendants merely denied making some of the statements,
and insisted that, because of their imperfect knowledge of
and inability to understandingly speak the English language,
those to whom the statements were made misunderstood
them. On the other hand, the persons to whom the state-
ments were made testified that the statements were made
deliberately and voluntarily, and that they distinctly and
precisely understood, remembered, and related them. But
the requests asked did not correctly state the rule. They

are argumentative, and invade the province of the jury with respect to the weight to be given that kind of evidence. It is not true, as stated in the requests, that all "confessions of prisoners out of court are a doubtful species of evidence," or that all "confessions when freely made are the weakest and most suspicious of all testimony, ever liable to be obtained by artifice, false hopes, promises of favor or menaces," etc. We all know, and so the authorities say, that confessions and admissions when made deliberately and voluntarily, and precisely understood and correctly remembered and related, constitute evidence of the most satisfactory character. To have given the requests, the jury necessarily would have understood that the court regarded the confessions as "a doubtful species of evidence," "the weakest and most suspicious of all testimony," and that it was obtained "by artifice, false hopes, promises of favor, or menaces," of which there was no evidence. In view of the conflict as to what was in fact said by the defendants, and as to their imperfect knowledge of our language, and of their inability to speak it readily, the court well could have admonished the jury to receive with caution and to view with scrutiny the testimony in respect of the claimed confessions or admissions, and that in determining the weight to be given it, and in ascertaining what was in fact said or stated by the defendants, the jury should consider whether what was said by them was deliberately stated or otherwise, whether they had the ability to and did clearly express themselves, whether they were precisely understood and correctly reported, the liability to err in understanding, remembering and reporting conversations and statements, the frequent inability to give the exact language of what was said, the motive, if any, to misstate it, the probability or improbability of the defendants making such statements, and all other facts and circumstances under which the claimed confessions or admissions were made, and should give such weight to the testimony with respect to them as the jury thought it was entitled to in view of all other evidence in the case. But the requests go far beyond this, and ask the court to

characterize the testimony as weak, doubtful, and suspicious, and as obtained by artifice and menaces, and to invade the province of the jury in determining the weight to be given the testimony. The requests were properly refused. (*Keith v. State,* 157 Ind. 376, 61 N. E. 716; Hughes on Instructions, sec. 319.) The authorities cited by the appellants do not support the giving of such requests as were here asked.

It will be observed that portions of the confessions or admissions as testified to by the witnesses for the state were disserving and portions self-serving. In view of this, the appellants requested the court to charge:

"No. 11. The court instructs the jury that, where the admissions of persons charged with crime are offered in evidence, the whole of the admission or confession must be taken together, as well that part which makes for the accused as that which makes against him, and if the parts of the statement which are in favor of the accused are not disproved and are not apparently improbable or untrue, when considered with all the other evidence in the case, then such part of the statement is entitled to as much consideration from the jury as any other part of the statement."

The law on the subject is as stated in 16 Cyc. 1041, where it is said that the self-serving part of an entire statement admitted in evidence should be duly considered and weighed with the unfavorable part, but that all parts of the statement are not necessarily to be regarded as worthy of equal credit. Of course, in an entire correlated statement the self-serving portion should be considered with the disserving, but, as stated, both are not necessarily to be regarded of equal weight or credit. But that, in effect, is the import of the request, and for that reason it was properly refused.

In view of Zaffy's testimony that there was no plan or scheme to rob or otherwise to commit any unlawful act, and that he did not participate in the robbery or homicide and was not present when it was committed except proceeding down the road awaiting Romeo's return from the closet, the appellants requested this:

"You are instructed that while one who aids, abets, or assists.
another in the execution of the commission of any crime—yet mere
presence or even acquiescence is not alone sufficient to charge one
as an accessory—before one can be held guilty as an accessory,
some affirmative acts or conduct must be proved beyond a reason-
able doubt."

The court refused it, and charged in the language of the
statute that all persons concerned in the commission of a
crime, whether it be a felony or misdemeanor, and whether
they directly committed the act constituting the offense, or
aid and abet in its commission, or, not being present, have
advised and encouraged its commission, are principals; and
further charged:

"You are instructed that, if you believe from the evi-
dence beyond a reasonable doubt that any one of the defend-
ants killed the deceased and that the act of killing was the
independent act of the person killing, then you are instructed
that the other defendant cannot be held for said killing, un-
less you believe from the evidence beyond a reasonable doubt
that the other advised, aided, abetted, assisted, or encour-
aged the one who did the act."

The request is incomplete and ambiguous. Though it be
assumed that the proposition intended to be conveyed was
that a "mere presence or even acquiescence" was not suffi-
cient to render Zaffy guilty, yet from the charge that was
given the jury would necessarily understand that a mere
presence or acquiescence was not so sufficient and that to
find Zaffy guilty, if he did not do but another did the kill-
ing, it was essential to find that he advised, aided, abetted,
or encouraged such other in the commission of such act. The
rights of the defendants in this particular were fully guarded.

The court charged:

"The law presumes the defendants innocent and not guilty
as charged in the information, and this presumption should
continue to exist and prevail in your minds until it is com-
pletely overborne and removed by the evidence introduced
in the case and the guilt of the defendants established and
proved by the evidence to your satisfaction beyond a rea-

·sonable doubt. ˙ This rule which clothes every person ac-
·cused of crime with the presumption of innocence, and im-
poses upon the state the burden of establishing his guilt be-
yond a reasonable doubt, *is not intended to aid any-
·one who is in fact guilty of crime to escape, but it is a*  **9, 10**
*humane provision of the law intended, so far as human
·agencies can, to guard against the danger of an innocent per-
·son being unjustly punished."*

Complaint is made of the italicized portion of the last
paragraph. Such a charge has been approved by some
·courts (*People v. Scarbak,* 245 Ill. 435, 92 N. E. 286; *Tur-
ner v. State,* 102 Ind. 427, 1 N. E. 869; *Hauk v. State,* 148
Ind. 254, 46 N. E. 127, 47 N. E. 465), and by others held·
not prejudicial (*State v. Medley,* 54 Kan. 627, 39 Pac. 227).
We do not approve it. Such a statement was neither neces-
·sary nor befitting to the proper submission of the case. No
good reason has been, nor do we think can be, given to sup-
port such a charge. It too much partakes of the court's
belief of the accused's guilt, and of its fear of an acquittal,
by the jury following and applying the law as to the pre-
·sumption of innocence and burden of proof. Courts ought
to stay out of the jury box, and should not undertake to do
indirectly what they must know they cannot do directly. It
is the duty of the court to give the jury the law, and their
·duty to accept it as given them. The law is, as stated by the
·Supreme Court of the United States in *Coffin v. United
States,* 156 U. S. 432, 15 Sup. Ct. 394, 39 L. Ed. 481, that
·"the principle that there is a presumption of innocence in
favor of the accused is the undoubted law, axiomatic and
·elementary, and its enforcement lies at the foundation of the
administration of our criminal law." And, as stated by
Lord Gillies in *McKinley's Case,* 33 State Trials, 275, that
"this presumption is to be found in every code of law which
has reason, and religion, and humanity for a foundation."
It is the undoubted duty of the court to state this principle
to the jury, as was done in the first paragraph of the charge
under consideration, and as was done in several other por-
tions of the charge, where the jury were explicitly instructed

that the defendants were presumed innocent, and that the
burden was on the state to prove their guilt of every element·
necessary to constitute the offense beyond a reasonable doubt.
But in stating it, it was neither necessary nor befitting to·
state whether the court approved or disapproved the rule,
whether he regarded it a wise or unwise, a humane or in--
humane, provision of the law. Nor was it proper to state to·
the jury that the rule was established not to aid the guilty
to escape, or "to guard against the danger of an innocent·
person being unjustly punished." Under our jurisprudence,
we all know that from time immemorial the burden has been·
cast on the actor to establish his cause in a civil suit by a·
preponderance of the evidence and in a criminal beyond a
reasonable doubt. This, not to shield the party in the wrong,
nor to protect the one in the right; but on the principle that·
he who seeks the court to move in his favor must satisfy the·
court of the truth and adequacy of the grounds of his claim,
both in point of law and fact. And because of this burden,
and because of the principle as stated by Greenleaf that "as·
men do not generally violate the penal code the law pre-
sumes every man innocent," the accused is presumed innocent
and the prosecution required to prove his guilt beyond a rea-
sonable doubt. These rules are not to be minimized or en-
larged as the court may think the exigencies of the case re-
quire, nor are they intended to be given effect only after the·
guilt or innocence of the accused has been determined and
then applied if he is found innocent, and not applied if found
guilty. Nor should it be assumed that there is one rule of
evidence for one thought to be guilty and another for one
thought to be innocent. These principles are applicable alike·
to all cases, and lie at the very threshold of all judicial in-
vestigations involving violations of penal statutes, and the·
parts of our judicial system to enable the court or jury in
trying the case to legally determine the guilt or innocence
of the accused and to reach a just and correct decision. How-
ever, since the court fully and correctly stated to the jury
the law as to the presumption of innocence and burden of
proof, we think the defendants were not prejudiced because

the court erroneously stated the reasons for the rule, and unnecessarily and inappropriately bespoke himself on that subject. We feel satisfied that the result would have been the same had this portion of the charge not been given.

On circumstantial evidence the court charged: "The court instructs you that circumstantial evidence is competent, and is to be regarded by the jury in all cases, and it is many times quite as conclusive in its convincing power as direct and positive evidence. When it is strong and satisfactory, the jury should so consider it, neither enlarging nor belittling its force. It should have its just and fair weight with you, and if, when it is taken as a whole and fairly and candidly weighed, it convinces the guarded judgment, you should convict; and on such conviction you are not to fancy situations or circumstances which do not appear in evidence, but you are to make those just and reasonable inferences from circumstances proven which the guarded judgment of a reasonable man would ordinarily make under like circumstances. If, after considering all the circumstances of this case in connection with the other evidence before you, you then have no reasonable doubt as to the defendants' guilt, you should convict them, but, if you then entertain such a doubt, you should acquit them. And in this connection you are further instructed that, to warrant a conviction, each fact necessary to establish the guilt of the accused must be proven by competent evidence beyond a reasonable doubt, and the facts and circumstances proven should not only be consistent with the guilt of the accused, but inconsistent with any other reasonable hypothesis or conclusion than that of guilt, to produce in the minds of the jury a reasonable moral certainty that the accused committed the offense charged." Complaint is made of the first paragraph of this. It is said that it is argumentative, too much on the weight of the evidence, and unduly emphasized the probative effect and "conclusive power" of such evidence. The court no doubt was prompted to give it because of the feeling often expressed by the laity not to convict on circumstantial evidence alone.

42 Utah 5

The rule obtains in this jurisdiction that in a criminal case, when the evidence on the part of the prosecution is alone of a circumstantial character, it is the duty of the court to state to the jury the rules applicable to that kind of evidence. (*People v. Scott,* 10 Utah, 217, 37 Pac.          **12** 335; *State v. Brown,* 39 Utah, 140, 115 Pac. 996.) This for the reason that a jury of inexperienced laymen without assistance from the court could hardly be expected to properly apply the rules applicable to that kind of evidence, and, if not so instructed and warned, there is danger of incorrect influences and illogical conclusions from jurors. And while the court, in the first paragraph relating to the probative effect of circumstantial evidence, may have transcended in some particulars the province of the jury, yet, when the whole charge on that subject is considered, we cannot believe that the jury in the consideration of that kind of evidence were misled, or induced to apply a wrong principle of law. Furthermore, the conviction of the defendants does not rest alone upon circumstantial evidence. There is direct and positive evidence, not only to show the commission of the offense, but also to connect the defendants with it. So, under all the circumstances, we do not think that they were prejudiced.

We have a statute which upon a conviction of first-degree murder gives the jury the discretion to recommend the defendant to life imprisonment. In the absence **13, 14** of such a recommendation, the court upon such a conviction is required to impose the death penalty. With the recommendation the court in its discretion may impose the death penalty or life imprisonment. In the case of *State v. Thorne,* 39 Utah, 140, 117 Pac. 58, we held that it was the duty of the court to state to the jury the provisions of the statute in that regard, and to inform them that the making or withholding of the recommendation was a matter entirely within their discretion, and that, in the discharge of that duty, the court should leave the jury free to dispose of the question without any intimation as to what should control or influence them in reaching a conclusion upon the matter.

We further held that the court there undertook to guide and direct the jury in the consideration and determination of the question, and, in effect, directed them that, in the disposition of it, they should be controlled by the evidence and the objects of punishment as explained to them by the court. We unanimously held that erroneous, and by a divided court to be prejudicial. Subsequently, and in a case involving the same transaction, but a different defendant, on application for rehearing in *State v. Riley*, 41 Utah, 225, 126 Pac. 294, where we had under consideration the same question and the same instruction, our holding in the Thorne Case, as to the prejudicial effect of such a charge, was, by a divided court, overruled, and the doctrine announced that such a charge though erroneous was, nevertheless, not prejudicial, at least not to such an extent as to require a reversal. In view of this we proceed to the matter in hand. The court here charged:

"And if there are circumstances in the case which, to the minds of the jury, would justify a recommendation that the defendants, or either of them, be imprisoned for life in case of a verdict of murder in the first degree, it is the right of the jury to make such a recommendation." It is urged that, by reference to other portions of the charge, the court used the words "circumstances in the case" synonymously with evidence, and by so doing gave the jury to understand that in the making or withholding of a recommendation they should be controlled by the evidence, "circumstances in the case," and that to make a recommendation there must be evidence—circumstances—"which to the minds of the jury would justify a recommendation." In the Thorne Case we held, and we reaffirm it here, that the discretion of the jury in the making or withholding of a recommendation is absolute, and is to be exercised by them without any expression or direction of the court as to the grounds or reasons for the mode in which they shall exercise it, and without any intimation as to what should control or influence them in reaching a conclusion on the matter. This is the undoubted weight of authority. In addition to the authorities referred to in

the Thorne Case supporting such view, we also refer to the following: *People v. Leary,* 105 Cal. 487, 39 Pac. 24; *People v. Ross,* 134 Cal. 256, 66 Pac. 229; *People v. Bawden,* 90 Cal. 195, 27 Pac. 204; *People v. Olsen,* 80 Cal. 122, 22 Pac. 125; *Garner v. State,* 28 Fla. 113, 9 South. 835, 29 Am. St. Rep. 232; *Hill v. State,* 72 Ga. 131; *Brown v. State,* 109 Ala. 70, 20 South. 103. Such an instruction as here has been criticised in *Cyrus v. State,* 102 Ga. 616, 29 S. E. 917, a case cited and approved by us in the Thorne Case. While a comparison of the two charges shows this to be much less objectionable than that in the Thorne and Riley Cases, yet we think it in a measure is calculated to convey the idea that, to warrant a recommendation to life imprisonment, the jury must find that there are sufficient circumstances in the case to justify such a recommendation, when the law is that they have the absolute right to make such a recommendation regardless of circumstances or evidence to justify it, the power to arbitrarily make such a recommendation without being required to point to circumstances or evidence to justify or to support it.

But, as was in effect held in the Riley Case, we now here also hold that the error was not prejudicial to the extent to justify us in reversing the judgment and remanding the case for a new trial. The defect here is one not readily perceived, and the complaint is more technical than substantial. We are persuaded that it did not injuriously affect the rights of the defendants, and that a charge with the objectionable features eliminated would not have produced a different result. If the jury felt disposed or inclined to make the recommendation, it is quite difficult to perceive in what way the objectionable portion of the charge caused or influenced them not to do so.

A further question in this connection is presented. The court, in connection with and at the conclusion of the charge, handed the jury different forms of verdict: "Guilty of murder in the first degree;" "guilty of murder in the second degree;" "guilty of voluntary manslaughter;" "guilty of involuntary manslaughter," and "not guilty."

The defendants' counsel, in taking his exceptions to the charge, in the presence of the jury, said: "I want to suggest that under the instruction that they have the right to recommend a life imprisonment where they find a verdict of murder in the first degree that there should be a verdict which specified that." The court: "I think the jury may, as explained in the instructions, that they make such a recommendation if they desire." Complaint is now made that the jury were not given a form of verdict guilty of murder in the first degree containing a recommendation of life imprisonment. It has been held in some jurisdictions that, although the trial court is not obliged to prepare forms of verdict, yet, if he undertakes to do so upon his own motion, the forms should be as complete as the case requires. 38 Cyc. 1870, and cases there cited. We have no statute requiring the court to prepare forms of verdict. We think, however, that it has been the general practice of trial courts to do that, and it may be that, when they undertake to do so, they should prepare forms as complete as the case requires. But we find it unnecessary to express an opinion as to whether the court here ought to have given the jury a form of verdict as suggested, for it is as apparent as anything can be that the jury were expressly given to understand that that form of verdict could be returned by them.

We have thus reviewed the questions thought to be the most subject to assault, and which are mostly relied on, and while, as indicated, the court in some particulars unnecessarily bespoke himself, yet the rule long established by courts and embodied in our statute is that mere error or mistake, unless it actually prejudiced the defendant, or tended to his prejudice, in respect of a substantial right, is not sufficient grounds for a reversal. And for the reasons heretofore given we are well satisfied that the errors or mistakes complained of did not injuriously affect the rights of the defendants and did not cause an unfair trial. Of that we have no doubt.

The judgment of the court below is therefore affirmed.

FRICK, C. J., and McCARTY, J., concur.