## STATE v. BARRETTA et al.

No. 2779.   Decided January 29, 1916.   (155 Pac. 343.)

1.  WITNESSES—CROSS-EXAMINATION—SCOPE.  Where one of three
    charged with larceny of cattle testified for the state, cross-
    examination, as to whether he did not understand the prosecu-
    tion against him would be dismissed if he so testified, is war-
    ranted to affect his credibility; for his understanding of the
    state's agreement is the essential matter.   (Page 482.)

2.  WITNESSES—COMPETENCY— KNOWLEDGE —CHARACTER WITNESSES.
    Where witnesses who lived in the vicinity stated that they
    knew the general reputation of defendants, who were charged
    with larceny, for honesty and integrity, they are competent to
    testify to defendants' good reputation for honesty, and the fact
    the witnesses had never heard the reputation of defendants
    discussed, but had heard them favorably spoken of, merely
    goes to the weight of the character evidence, and not of its
    admissibility.   (Page 484.)

3.  WITNESSES—KNOWLEDGE—CHARACTER WITNESSES.  In a prose-
    cution for larceny, a witness who lived in the same county,
    but about five miles away from the town in which defendant
    resided, may, where he was acquainted at such point and knew
    defendant's reputation, testify as to defendant's good reputation
    for honesty and integrity.   (Page 487.)

4.  LARCENY—PROSECUTION—PRIMA FACIE CASE—BURDEN OF PROOF.
    Comp. Laws 1907, sec. 4355, declaring that possession of recent-
    ly stolen property shall be prima facie evidence of guilt when
    the possessor fails to make satisfactory explanation, while per-
    mitting the state to go to the jury upon proof of the larceny
    and of accused's possession and unsatisfactory explanation,
    does not relieve the state of the burden of proving accused's
    guilt beyond a reasonable doubt.   (Page 488.)

5.  LARCENY—PROSECUTION—INSTRUCTIONS.  As the question of what
    makes out a prima facie case of larceny is for the court, and
    as the state has the burden at all times to establish accused's
    guilt beyond a reasonable doubt, it is improper to charge that,
    under Comp. Laws 1907, c. 4355, possession of recently stolen
    property shall be deemed prima facie evidence of guilt when
    the party in possession fails to make a satisfactory explanation;
    for the jury may be confused into believing when such posses-
    sion and unsatisfactory explanation is shown that the burden
    of proof would be cast upon accused.   (Page 488.)

6.  CRIMINAL LAW—EVIDENCE—CONSPIRACY. Declarations made by
    one co-conspirator out of the presence of another after the con-
    spiracy has been carried out are inadmissible against the other
    conspirator. (Page 490.)

Appeal from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Victor Barretta, Joe Melea, and another were indicted for larceny, and, the last two defendants being convicted, they appeal.

REVERSED AND REMANDED.

*Thomas Marioneaux,* and *L. L. Baker,* for appellants.

*A. R. Barnes,* Atty. Gen., and *E. V. Higgins* and *G. A. Iverson,* Asst. Attys. Gen., for the State.

STRAUP, C. J.

The three defendants, Barretta, Melea, and Tomljenovich, were, by the information, jointly charged with the larceny of a steer. We shall refer to them as B., M., and T. The case was proceeded against the last two named defendants only, who were convicted and appeal.

T., with others as partners, was engaged in the butcher business at Tooele. M. resided at Stockton, in the same county. He had resided there about five years. His business was that of a miner and leaser. He also traded horses, bought and sold cows, and did some butchering. B. was in his employ. About a week before the alleged larceny, M. sold four head of cattle to a competitor of T. and his partners. He was thereupon solicited to procure cattle for T. and his firm, and in pursuance of which it was arranged that T., M., and B. should go to a place known as Orr's ranch in Skull Valley to purchase cattle. M. took with him $600 for that purpose. On a Saturday night they reached a place called Russell's ranch owned by M. There they stayed all night. The next morning M. and T. proceeded on to Orr's ranch. They left

B. at the Russell ranch, M. giving him $150 with which to buy cattle if he found any among the farmers in that vicinity.

From this point the evidence is in conflict. T. and M. testified that they went to the Orr ranch, and, finding no cattle there, returned in the afternoon to the Russel ranch. As they approached, they saw B. driving two head of cattle toward the ranch. He informed them that he had purchased them from a cowboy and paid him ninety dollars for them, and returned the other sixty dollars of the $150 to M. The three proceeded to Stockton; M. and T., most of the way, riding in a wagon ahead, and B. following with the cattle. From there the cattle were driven by T. and B. to Tooele. The next day M. went to Tooele, when one head was disposed of to T. and his firm, and the other to their competitor. M. then returned to Stockton.

B., a witness for the state, testified that M. and T., in the morning, left him at the Russel ranch to take care of the horses; that, when he next saw them in the afternoon, they came along driving the two head of cattle; and that then the three proceeded to Stockton. There is no doubt that the cattle were stolen. To inquiries of the sheriff, B., in M. and T.'s presence, stated that he had purchased them in Skull Valley from a cowboy with a smooth face, dark complexion, and about thirty-five years of age. On the witness stand B. admitted making such statements, but testified that they were false, and that he made them because he was coerced and told to do so by M. The three were arrested. M. furnished bail for B. M. asked B. to take him to the man whom he claimed had sold the cattle. B., at two different times, took M. to a place called Condie's ranch where they saw two men, but B. was not able to find the man whom he claimed had sold the cattle. Later B. escaped, or went away. M., who was on his bond, offered a reward for his recapture and sent men out to search for him. He was apprehended and rearrested.

B., after testifying, in effect, that he had not, but that T. and M. had, stolen the cattle, was asked on cross-examination:

"Don't you understand that your case is to be dismissed if

you will testify against the defendants (appellants) in this case?"

To this the district attorney objected upon the ground of an assumption not shown by the record. The court sustained the objection on the ground of indefiniteness, calling for the witness' "understanding" instead of what "some one had told him." Here, the ruling is defended on the ground that such matter was cross-examination within the discretion of the court. It is familiar doctrine (5 Jones, Commentaries on Evidence, Section 826) that:

"For the purpose of testing the credibility of a witness, it is permissible to investigate the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, inclinations and prejudice, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory, and description."

As effecting credibility, the question was pertinent inquiry of motive and interest, and, for that purpose, was competent. The state concedes that, but urges that the matter rested within the discretion of the court. No doubt, in many instances, the manner of conducting the examination of a witness, and the course of proceeding in the cross-examination, are matters resting in the sound discretion of the trial court (Jones, Section 826) and also, no doubt, may limit a needless prolongation of a cross-examination, or unnecessary repetitions of interrogations. But the court may not deny the right of legitimate cross-examination itself. Says Jones (section 828):

"It has frequently been held that it is error not to permit cross-examination as to the state of feeling or bias of the witness. But the extent of such cross-examination is within the sound discretion of the court. * * * Nevertheless, the range of cross-examination should not be restricted within bounds so narrow as not to embrace questions affording the defendant a reasonable opportunity to test the accuracy and show, if he can, the falsity of the statements of the witness. * * * The defendant's right of cross-examination, if so abridged and confined to such limits as to be useless to him, amounts to a denial of an absolute and valuable right; for, while the court has a large discretion as to the range and extent to be permitted on cross-examination, the discretion does not extend to the

denial of cross-examination going to substantial matters within legitimate bounds."

The defendant, to affect the credibility of the witness, had the undoubted right, on cross-examination, to show the motive or interest of the witness. To deny that is to deny one of the fundamentals of cross-examination itself. The state claimed the witness was an accomplice. The court, in submitting the case, charged, "the state concedes that the witness Barretta is an accomplice," and that, "if he was guilty of the theft or participated therein," a conviction could not be had on his testimony alone. Appellants contended that he alone was the thief. He himself, with the appellants, was jointly charged with the offense. The inquiry of whether he did not understand that "your case is to be dismissed if you will testify against these defendants" undoubtedly tended to show motive and interest. The court indicated that inquiries could be made as to whether any promise of immunity had in fact been made him, but that his "mere understanding" that the case was to be dismissed, if he testified against the appellants, was too indefinite and speculative. This is well answered by the court in the case of *State* v. *Kent,* 4 N. D. 577, 62 N. W. 631, 27 L. R. A. 686. Said the court:

"The only object of proving that the accomplice has or has not been promised total or partial immunity is to strengthen or weaken his credibility by showing that his testimony is given possibly without hope, or that in giving it he may be influenced by an expectation of total or partial exemption from punishment, as a reward for such testimony. Even if no express promise of immunity is made, the accomplice may be led to believe by something in the conduct or speech or tone of voice of some one connected with the prosecution that nevertheless his testimony involving another in guilt with him will earn him some consideration at the hands of those who control his fate. We are therefore clear that, even when all the positive evidence is against the proposition that any express promise has been made, it is competent to ask the accomplice, as affecting his credibility, whether he expects to have full punishment meted out to him. Even when the accomplice has nothing in the way of word or conduct from any one connected with the prosecution on which to build an assurance, he may have some expectation—leading all the way from a faint glimmer of hope to confident belief—that, if

his testimony results in the conviction of another, he himself will reap some reward."

The main factor was the state of mind of the witness; hence what "he understood," or expected, or believed with respect to granting him immunity or amelioration, is the very kernel in the shell. It is also familiar doctrine that great latitude is allowed in cross-examining an accomplice including "questions tending to injure his credit or to prove his accuracy or veracity." 2 Elliott on Evidence, Sections 9, 10. All the texts say, and all the cases hold, that. We think the court erred in the ruling and thereby denied appellants a substantial right.

Another point is made with respect to testimony of good character. A witness was called who testified that he had lived in Stockton for forty years and there knew M. for three and one-half years, and that "I know his general reputation for honesty and integrity in Stockton, and that it is good." On cross-examination he was asked, "How did you find out his general reputation" and answered: "Well, I had business with him. As far as my business with him is concerned, I know his reputation is good," and that he based his answer on that. On redirect he, however, further testified that Stockton was a small town of about 200 inhabitants, and that he knew about everybody in the town, and that he had known people who has associated with M., and that "I know his reputation because I know the people he has associated with and I know the people that I have associated with. * * * Knowing practically all of the people that M. must have known the three and one-half years that he has been there, that is part of the reason why I say his reputation is good. The other part of the reason is that he has been extraordinarily prompt; has been a good paymaster. I never lost a cent through him. I have trusted him and he has paid. He is a good business man."

Another witness testified that "he had lived in Tooele for about sixty years and was acquainted with T. and had known him for about five years; that he had occasion to meet and deal with those who had been acquainted with T. and had talked with them about him and had been present when the kind of man he was was discussed, and from associations.

had, and talks he heard, in the community, he was able to state as to T.'s general reputation for honesty and integrity in Tooele, and that it was good. In response to questions he, on cross-examination, stated he did not know anything about his general reputation; that his answers were based on what he personally knew of T., and of his acquaintance and experience with him, and not what he heard in the community from other people, but that he had never heard anybody say anything against him. Then, on redirect, he further testified that he heard "people speak favorably about him, and that I never heard anything against his character in my life; but, as far as my experience and what people think generally, I don't know, only that I have heard people speak favorably of him, and never heard anything against him."

Another witness testified that he lived in Grantsville, which was about five miles from Tooele and in the same county; that he was acquainted with T.; and that his reputation in Grantsville for honesty and integrity was good. On cross-examination he testified that T. did not live in Grantsville, but in Tooele, but that he was acquainted in Tooele and had done business there, and that T. was acquainted in Grantsville and had frequently visited that place and did business there, and that he knew the people with whom T. had done business in both Tooele and Grantsville.

The testimony of the last witness was stricken because he resided in Grantsville and T. in Tooele, and hence he could not know the general reputation of T. in the community where T. resided. The testimony of the other two witnesses was stricken upon the ground that it was not shown that they had sufficient knowledge of the general reputation of either M. or T.

Ordinarily, a witness' knowledge of another's reputation is shown by asking him if he knows his general reputation, etc.; and, if he answers in the affirmative, he, generally, is regarded qualified to state what it is. But when more particularly explained to him, that reputation is the estimation in which one is held, or the character or traits imputed to him, by others generally in the community, and not how the witness, apart from such others, may regard distinctive marks or traits be-

longing to such other, or how he may only personally regard him, he, unless he heard such person talked about, or opinions ·expressed as to his traits, is prone to answer that he does not know what such person's reputation is—what the people gen- ·erally in the community think of him because he had not heard his character discussed—though the witness and such other may, for almost a lifetime, have lived in the community and have known about every person living in it, and have full knowledge of the associations, dealings, and minglings of each with the people of that community, and hence given every opportunity to know the estimation in which such other is reputed in the community. That, largely, seems to have been the trouble here. The witnesses in the first instance, on direct examination, qualified and stated that they knew the general reputation, etc., and that it was good; and while on cross-ex- amination they, or some of them, stated that such character or reputation had not been discussed, and that they had not heard opinions expressed concerning it, and therefore stated that their answer that the reputation was good was based, or partly based, on what they personally knew of the appel- lants, and the estimation in which the witness personally, and not the community, regarded them, still further testified, in that connection, as to their and the appellants' residence, acquaintance, associations, and dealings in the community, and that they heard the appellants spoken of favorably and had not heard anything against them. The mere statement of a witness, that he has or has not knowledge, may not always be conclusive. His qualifications are to be determined from all that is made to appear. Looking alone to the direct ex- amination of the witnesses, their qualifications to testify are sufficiently shown. That, we do not think, was so completely overthrown by the cross-examination to justify striking the testimony. The cross-examination may have affected the weight of the testimony, but did not destroy the competency of the witnesses. The testimony at least was negative evi- dence of good character. That many courts say is good, some of them the best, evidence of good character. The court, in the case of *Hinson* v. *State*, 59 Fla. 20, 52 South. 194, 138 Am. St. Rep. 118, well stated:

"A witness is not competent to testify to the reputation of another person, unless he can say that he believes he knows the general reputation of such person in the community. While the knowledge of the witness must extend to the other's general reputation, one who has been personally acquainted with another for a considerable length of time, and who has been in a position where he probably would have heard that other's reputation talked about, were it the subject of comment, as seems to be the case with the witnesses here, and who has never heard it questioned, may testify to the good reputation of such person. Such a witness may testify to good reputation by saying that he has never heard anything said against the person."

To this effect are, also, Wharton, Crim. Ev. (9th Ed.) section 58; 3 Ency. of Evidence, p. 43; 3 Rice on Ev. Section 380; *Flemister* v. *State,* 81 Ga. 768, 7 S. E. 642; *Gifford* v. *People,* 148 Ill. 173, 35 S. E. 754; *Foerster* v. *United States,* 116 Fed. 860, 54 C. C. A. 210; *State* v. *Nelson,* 58 Iowa, 208, 12 N. W. 253; *People* v. *Adams,* 137 Cal. 580, 70 Pac. 662; *Spencer* v. *State,* 132 Wis. 509, 112 N. W. 462, 122 Am. St. Rep. 989, 13 Ann. Cas. 969; *People* v. *Van Glassbeck,* 189 N. Y. 408, 82 N. E. 718, 22 L. R. A. (N. S.) 650, 12 Ann. Cas. 745; *State* v. *Grate,* 68 Mo. 22. And that is the current and modern authority.

A case much in point, and where it was held error to strike testimony similar to that stricken here, is that of *State* v. *Hosey,* 54 Wash. 309, 103 Pac. 12, 22 L. R. A. (N. S.) 670. We quote further from *Flemister* v. *State, supra*:

"Where a witness testified that she knew the general character of another witness, that she had never heard any one say anything against it, and that she knew such character of her own knowledge, and had resided in the same city with the witness sought to be impeached for a long number of years, and had known such witness intimately, it was not error to refuse to rule out the testimony because she also testified that she was not testifying from what people said as to such character, but from her individual knowledge."

That the witness who resided at Grantsville but five miles from Tooele and in the same county was, in view of his testimony that he was acquainted in Tooele and T. in Grantsville, competent to testify as to T.'s reputation, is supported by *People* v. *Glassbeck, supra.*

Another point relates to the charge. We have a statute

(C. L. 1907, Section 4355) which, after defining larceny, further provides that:

"Possession of property recently stolen, when the party in possession fails to make a satisfactory explanation, shall be deemed *prima facie* evidence of guilt."        **4, 5**

This the court, in the language of the statute, charged the jury. Complaint is made of it. It, in effect, is urged that the statute is wholly for the court and for its guidance in determining questions of sufficiency of evidence to submit the case to a jury, and is not a rule of evidence to guide or direct them in determining the guilt or innocence of the accused as matter of fact. In the case of *State* v. *Potello*, 40 Utah, 56, 119 Pac. 1023, we said that independently of a statute the authorities were in conflict as to whether recent possession of stolen property is even evidence against the accused without a showing of also an unsatisfactory explanation of the possession, and particularly as to whether, without such showing, the evidence as matter of law is sufficient to support a conviction. The earlier holdings of our territorial Supreme Court are to the effect that but proof of the larceny and recent possession was not sufficient to warrant a conviction. A contrary doctrine was supposed to have been declared in a later case by the Supreme Court of the state. The cases are referred to in the *Potello Case.* The Legislature adopted the statute which, as we said in the *Potello Case,* in the absence of other evidence, to make a *prima facie* case required proof of three things, the larceny, recent possession in the accused, and an unsatisfactory explanation of his possession. When these are shown, the court is not justified in withholding the case from the jury. But if only the larceny is shown and recent possession in the accused, that is not sufficient to justify a submission of the case, and does not warrant a conviction. We there said:

"To say, under the statute, that the state has made a prima facie case of guilt by the mere proof of the larceny and recent possession in the accused, is to say something not declared by the statute. If the Legislature had intended that, it may be presumed it would have said so in language which readily would convey such a meaning. The language employed does not convey that meaning."

It may be the Legislature required too much to make a *prima facie* case, but we have nothing to do with that. It is enough to know what it, in such respect, in most unmistakable terms said, and, if any hardship shall come of it, the Legislature, and not we, must take the responsibility. Undoubtedly, the court has to do with questions of a *prima facie* case whenever it withholds from, or submits a case to, the jury. But that determination, like all questions of sufficiency of evidence, to warrant a conviction, is one of law and not of fact. When a court submits a case to a jury, the court necessarily determines that there is sufficient evidence to justify a conviction. The court cannot leave that question to a jury. To do so would be to make the jury judges of both the law and of the facts. So, when such a case as this is submitted to a jury, they have nothing to do with questions of what is, or what is not, a *prima facie* case; nor are they required to make a finding in such respect. They, to convict, are required to find the accused guilty beyond a reasonable doubt. If they do not so find, they are required to acquit regardless of whether a *prima facie* case was made or not. Juries have only to do with questions of a *prima facie* case when there is a shifting of burden of proof. But here there was no shifting of burden, either of proof, or duty of going forward. The state at the start had the burden to establish beyond a reasonable doubt every essential allegation of the information, and that burden, without shifting, remained with the state throughout the entire case. So, when there is no shifting of burden of proof or duty of going forward, we see no good purpose, in the submission of a case, to inform the jury what constitutes a *prima facie* case. As well inform the jury on every submission of a case that the court is of the opinion that a *prima facie* case is made and the grounds upon which the opinion is based, and that therefore he submitted the case to them. We think a charge, that recent possession of stolen property when the party in possession failed to make a satisfactory explanation was *prima facie* evidence of guilt, may do harm by singling out and emphasizing particular evidence in a cause to the exclusion of other evidence which may be of equal or greater importance, and, without further explanation or di-

rection, may tend to convey a meaning to the jury that when such enumerated particulars are shown the burden of proof is shifted to the accused, which, if not sustained by him, requires the verdict to be cast against him. *Dobson* v. *State,* 46 Neb. 250, 64 N. W. 956; *Williams* v. *State,* 60 Neb. 526, 83 N. W. 681; *Van Stratten* v. *People,* 26 Colo. 184, 56 Pac. 905; *McCoy* v. *State,* 44 Tex. 616; *State* v. *Bliss,* 27 Wash. 463, 68 Pac. 87; *State* v. *Sasseen,* 75 Mo. App. 197; *State* v. *Lax,* 71 N. J. Law 386, 59 Atl. 18. Of course, the jury, upon the matters alone which the statute declares is a *prima facie* case, may find the accused guilty, if they, upon such proof, are convinced beyond a reasonable doubt of his guilt. But just as certain is it that they, if not so convinced, are required to acquit him, though such matters may not even be disputed or contradicted by any evidence whatever. So we do not see what the question of a *prima facie* case has to do with the jury and think the charge ought not to have been given.

The state also contended that upon the evidence the three defendants had entered into a conspiracy to steal cattle. In view of that, the court gave this:

"Certain testimony has been introduced in evidence as to statements made by one or another of the defendants at different times in the absence of one or both of the others. You are instructed that such statements are evidence only against the person making them, unless you find from the evidence beyond a reasonable doubt that a conspiracy or combination of two or more of them to steal cattle as hereinafter stated is proven by the evidence, and then against those only who are parties to such conspiracy, and then under the further conditions as hereinafter stated."

No "further conditions" were stated, except to define conspiracy. Complaint is made of the charge. The instruction is not good because the statements of one alleged or claimed conspirator as evidence against another was not restricted to statements or admissions made by him in pursuance or in the course of the conspiracy, and before the transaction had ended. It left the proposition so that statements made by one claimed conspirator, after as well as before the transaction had wholly ended, was evidence, not only as against him, but also

as against every other connected with the conspiracy. That, undoubtedly, was error, and was prejudicial because of statements made by B. in the absence of T. and M. after the transaction had wholly ended.

The judgment is reversed, and the case remanded for a new trial.

FRICK and McCARTY, JJ., concur.