## STATE v. DUNKLEY.

No. 5535.   Decided January 7, 1935.   (39 P. [2d] 1097.)

548

H. C. Beck and P. G. Ellis, both of Salt Lake City, for appellant.

*Joseph Chez*, Atty. Gen., and *S. D. Huffaker*, Deputy Atty. Gen., for the State.

STRAUP, Chief Justice.

Fred Nobel Endel, alias Henry Regan, and Sheril Dunkley by information were jointly charged with first degree murder, the killing of Freda Gibson, March 27, 1933, in Salt Lake City, by striking and beating her with a blunt instrument and choking and strangling her, thereby inflicting on her mortal wounds and injuries then and there causing her death. Endel and Dunkley were represented by different counsel. When arraigned, both were given time to plead. May 13, 1933, both were brought forward to enter their plea. Dunkley entered his plea of not guilty and demanded a separate trial, which was granted. Trial of his case was set for May 29. Endel at his request was given further time to plead. He entered his plea of not guilty on May 17 and his case set also for May 29. The case against Dunkley was brought on for trial June 5. No further order was made or time fixed for the trial of Endel. The case thus proceeded alone against Dunkley. It was tried before the court and a jury. Endel, with his consent and with the consent of his counsel, was called as a witness on behalf of the state. During the trial, his counsel, at least a portion of the time, sat with counsel for the prosecution and collaborated with them. A verdict of guilty of murder in the second degree was rendered against Dunkley June 14. On June 17 he filed a motion in arrest of judgment and a motion for a new trial. On the same day the court sentenced Dunkley to imprison-

ment in the state prison for a term of forty years and ordered that the sentence be stayed pending the final determination of the motions. On June 24, Dunkley's motion for a new trial came on regularly to be heard, but the court on his own motion continued the hearing until June 27. On June 24, the same day Dunkley's motion for a new trial was to be heard, on motion of the district attorney, the charge of first degree murder against Endel was reduced to second degree to which Endel entered a plea of guilty, and on the court's own motion the time to pronounce sentence was continued until June 28. On June 26 the court, on his own motion, further continued the hearing on Dunkley's motions for arrest of judgment and for a new trial, and the time to pronounce judgment on Endel until July 1. On July 1 the court heard the arguments on Dunkley's motions and took the same under advisement, and on that day sentenced Endel to imprisonment in the state prison for a term of forty years. On July 29, and on good cause made to appear, Dunkley was permitted to file an affidavit of Endel and affidavits of others in support of his motion for a new trial. On August 2, 1933, the Dunkley motions were overruled and a commitment issued in accordance with the judgment theretofore pronounced and entered against him on June 17. Dunkley in due time prosecuted an appeal from the judgment and caused a transcript of the record consisting of the judgment roll and bill of exceptions to be transmitted to this court.

There are numerous assignments of error, twenty-five or more heads and about that many more subheads. To review and pass upon all of them would require a consideration of most of the criminal code of procedure. However, the principal assignments are: (1) Insufficiency of the evidence to connect Dunkley with the commission of the charged offense. (2) Permitting the state "to refresh the memory and recollection" of Endel, a self-confessed and conceded accomplice called as a witness by the state, by calling his attention to statements made by him to police of-

ficers, the assistant district attorney, and reading to him parts of a confession of guilt made by him to police officers, in which statement and confession he in some particulars implicated Dunkley. (3) Unduly restricting the cross-examination of Endel by counsel for Dunkley. (4) Admittting in evidence a so-called confession of Dunkley wihout sufficient showing that it was made voluntarily. (5) Failure of the court to submit to the jury the evidence adduced and heard before the court in the absence of the jury bearing on the question of voluntariness of the confession. (6) Alleged errors of the charge to the jury and refusing requests to charge. (7) Overruling appellant's motion for a new trial.

The principal question as to insufficiency of the evidence is that there was not sufficient evidence independently of the testimony of Endel, the accomplice, to connect the defendant with the commission of the offense. Mrs. Freda Gibson was about 75 years of age. She for some time lived alone in the southwest part of Salt Lake City on or near West Temple and between 7th and 8th South streets. She there owned several houses, living in one of them and leasing the other, a double house, to tenants. She was rather a recluse, living by herself quite economically and modestly without much of any company, and frequently was seen walking out about the neighborhood and up town sometimes late in the evening, always peaceful and attending to her own affairs and not disturbing or molesting any one. On the early morning of March 28, 1933 (at about 12:25 or 12:30 a. m.), a fire was discovered in the house occupied by the deceased. The fire department in response to an alarm promptly responded and extinguished the fire. The firemen testified that the doors and windows of the house were closed and when they entered they found a smouldering fire in the front room and in the kitchen of the house, principally behind doors, among rags, paper and other material scattered about, and several chairs partly burned. The dead body of Mrs. Gibson was found lying on the floor

of the kitchen with a plush black coat on partly on fire about the left shoulder and a galosh on her left foot. She also had on an old-fashioned pair of men's trousers, one leg of which was tucked in the galosh or a high topped buckle overshoe, the other leg tucked in a high topped laced shoe, her hat lying nearby on the floor. As described, she apparently was dressed as though she had just got into the house from outdoors, when she was assaulted and killed before she had taken off her coat or other apparel. Her body, by firemen and policemen, was removed from the kitchen and taken outside and the fire on her coat and galosh extinguished. Her body was still partly warm with body heat, her arms and legs limp, and when her body was lifted, it "folded up like a jackknife." One of the witnesses who handled and examined the body as it was carried out of the house testified that neither the arms, hands, nor legs of the deceased were tied or bound; that there was no tape, bandages, or cloths about the head or face or body of the deceased; that her arms and legs were untied and hanging free and limp. No witness testified to the contrary. There were contusions, bruises, lacerations, and hemorrhages about the head and face, the left jaw fractured, bruises on the lips, contusions on the chest, two ribs broken, inside hemorrhages about the chest and hemorrhages below the frontal portion of the brain, contusions and marks about the throat having the appearance of choking or strangulation, burns on the left thigh, on the left side of the face, and on the left hand, but the burns, as explained by the physicians, were produced after death. The physicians testified that the injuries as described by them were inflicted at about the same time by some blunt instrument and that they were sufficient to cause almost immediate death or within fifteen or twenty minutes after the injuries were inflicted. Firemen and police further testified that when they entered the rooms of the house of the deceased, boxes, clothing, rags and papers were scattered about, an old trunk "ransacked" and its contents scattered about the floor, a bed mattress

ripped open and the whole thing about the rooms "in a mess and disorder." Firemen gave it as their opinion that, with the house closed as it was, the fire smouldered for about half an hour before they arrived.

Evidence was given to show that at or between 7:30 or 8 o'clock p. m. on March 27, the deceased with her plush coat on was seen in a grocery store nearby purchasing some articles in the store, and that she remained only from three to five minutes. At about that time, the deceased also was seen talking in front of her house for a few minutes with some undescribed and unknown man. That they then went into one of the apartments of the double house, remained there about five minutes and then the man went away. The same witness later that evening at about 9 o'clock heard some noise that sounded like glass falling or tin being picked over and then saw a light like someone striking a match, at the side of Mrs. Gibson's place, saw a man come around from the side to the front of the house, light a cigarette and then go away; that he was dressed in a dark suit, but the witness was unable to say whether or not it was the same man she saw earlier in the evening at 7:30 o'clock. The deceased was not again seen alive, except as testified to by one witness who passing by at about fifteen minutes to 12 o'clock on the night of the 27th, and that she then dressed in black was outside her house near a tree. It is not shown that any money, papers, or anything was taken from the house or that any of the effects of the deceased was missing.

Endel, which was his true name, had four or five aliases. He formerly lived in Texas. He came to Salt Lake City about two years prior the homicide. Here he was generally known as Henry Regan and during a part of that time under that name was employed as a switchman with a railroad company in Salt Lake City. He had been married about two years, living with his wife at Salt Lake City. For six or seven months prior the homicide he lived in one of the double houses of the deceased, first at a rental of $15 a

month which later was reduced to $12. In the latter part of February, 1933, about a month prior the homicide, he was indebted to the deceased in the sum of $75 for rent. She then caused his wages due him from the railroad company to be garnisheed, $50 of which was applied on his rent. On March 10 she again garnisheed his wages. That nettled and angered him, he claiming she had agreed not to further garnishee his wages. He lost his employment, moved out of the house, and rented another six or seven blocks away. Several weeks before he moved out he had a controversy with the deceased concerning the wording of a receipt for payment of rent, the receipt reciting the amount stated was to apply on rent, he contending the receipt should state, "Payment in full." He went away and came back with the receipt when the deceased slammed the door in his face. He smashed the glass in the door, reached inside, unlatched it, entered the room and compelled her to sign a receipt as desired by him. Endel, he so testified, excessively indulged in intoxicating liquor, frequently got drunk, at times had illusions, and on the night of the homicide, in which he admittedly participated, he was so drunk that his memory and recollection as to what took place was "hazy." He further testified Dunkley lived in the same or nearby neighborhood where the deceased lived; that he was acquainted with him for about a year; that he frequently got liquor from him and got some on the day and night of the homicide. Dunkley's occupation was that of a fruit packer, but at the time in question he was out of employment.

Endel, a self-confessed accomplice and who by his written confession to police officers had admitted his guilt, was, with his consent and with the advice and consent of his counsel, called as a witness by the state, his trial having been postponed to a future day. The state to convict Dunkley was required to rely and did rely on the testimony of Endel and without his testimony the state was unable to prove a case against Dunkley. On his direct examination, so far as here material, he in substance testified that he had

a conversation with Dunkley at his residence "with reference" to the deceased at about 11 o'clock in the morning of March 27, 1933. He testified, "I called there to obtain and got a few drinks. I don't remember how long I was in the house that morning or just what was said about Mrs. Gibson, but I went to Woolworth's (store) and bought two pair of rubber gloves, a roll of adhesive tape and some adhesive bandages." When he came back, he had "a few more drinks and left the adhesive tape, the bandages and a pair of gloves" at Dunkley's house. He testified, "I don't remember what the conversation was with reference to Mrs. Gibson. It isn't clear to my mind. Q. What did you take these gloves down there for? A. To keep from showing your finger prints and to have them for Dunkley to wear. I had some conversation with him prior to that, but I don't remember just what it was or when it was or what was said about getting the adhesive tape." He then at some length testified concerning the trouble he had with the deceased arising out of the garnishments, and that at about 7 o'clock in the evening of March 27 he went back to Dunkley's house, got "a couple of drinks and a bottle," but Dunkley was not there at that time; that in about a half or three-quarters of an hour—at about 7:30 or 7:45—he met Dunkley at a public street corner or crossing about a half block from the house of the deceased. In response to questions propounded to him by the district attorney, some of which were leading, the witness further testified that they met there by appointment made in the morning; that "Dunkley was to go to Mrs. Gibson's house and tie her up"; and that the witness was to meet Dunkley at the corner at the time and place stated. In response to further leading questions propounded to him, the witness further, over the objection of counsel for Dunkley, answered that Mrs. Gibson was to be tied up "with the intention to rob the place." When asked by the district attorney what was said in such respect, the witness answered, "I don't remember the exact words what was said." Upon further questions propounded to him, he stated that he

"got the gloves and tape and that they were to be used there without leaving any finger prints; it was talked about and discussed, and that the adhesive tape and bandages were to be used for the purpose of her not recognizing me; that was about all." He further testified that when he and Dunkley met on the corner of the street he handed him "a little carpenter's pinch bar," belonging to the witness, but he was not sure whether Dunkley took the bar or not. He further testified on meeting at the corner and talking for a few minutes, he and Dunkley went to the house of the deceased somewhere between 7:45 and 8 o'clock in the evening and entered her house by means of an unlocked door; that he saw the deceased lying on the floor "tied up. Had her hands tied with tape and tape around her face," which he presumed was the tape he had purchased and given to Dunkley; that they passed her lying on the floor and went into the next room where they found an unlocked trunk and while the witness held a flashlight, Dunkley went through the trunk; that it took them quite awhile opening and looking at packages, some hundred of them: that "in the meantime Mrs. Gibson moved or something and it was thought she better be tied up some more and the batteries of the flashlight got weak all of a sudden. * * * I had a bottle of whiskey in my pocket and I offered Dunkley a drink. He wouldn't take any, and I took a drink and we left the house. We thought we better get some more adhesive tape and bandages and I went to a drug store" nearby "to get some more tape and bandages while Dunkley went to get the flashlight." He testified that was between 8:30 and 9 o'clock; that they were gone fifteen or twenty minutes, then went back into the house of the deceased and, while the witness held the flashlight, Dunkley tied and bandaged her some more; that they remained there about another half hour or more; that it was impossible to find anything and "gave it up as a bad job," and when they departed the deceased was lying on the floor bandaged and hands tied behind her, the witness going one way, he said to his house,

Dunkley another, he did not know where he went. The witness was asked if he had any conversation with Dunkley as to what he was going to do after leaving the house and the witness answered, "If I did, I don't remember it." Then the district attorney, over the objection of counsel for Dunkley, to "refresh the recollection" of the witness, was permitted to ask him if he had not stated to the police that it was agreed between the witness and Dunkley that he was to go back and turn Mrs. Gibson loose, to which the witness answered, "I might have made that statement at the Police Station, but I don't remember it." The witness then further, in response to questions by the district attorney, testified that the next morning after the homicide he went over to Dunkley's place to get a drink of whisky and after leaving the house there was something said about the death of Mrs. Gibson, the witness stating to Dunkley that he had seen something about her death in the newspapers but that, "I don't remember what it was and it is not clear in my mind." When asked if anything was said about the fire, the witness answered, "I believe there was something said about the fire, but I don't just remember what it was." The district attorney then again, to "refresh his recollection," asked the witness if he recalled a conversation had with the assistant district attorney and others the day before at the county jail, to which he answered that he had a conversation, and when asked if that refreshed his recollection, the witness answered that it did, and then was asked what was said between him and Dunkley about the fire, to which the witness answered, "I believe that I asked him if he set the place on fire.

"Q. What did he say, if anything? A. I don't remember what his answer was."

Then the district atttorney asked him if his memory was not as good "now as it was yesterday," and then asked him,

"Q. Don't you recall telling Mr. Wire (a police officer) and myself yesterday what Dunkley's answer was? A. No sir.

"Q. When you asked him if he set the place on fire— A. I don't think I put the question to Dunkley.

"Q. Just how did you put it? A. If he set the place on fire.

"Q. What did he say, if anything? A. Not intentionally if he did, I believe was the way he said."

All that was objected to by counsel for Dunkley, as to what the witness had stated to the district attorney and the police officer.

The witness again several times was further asked concerning his conversation with Dunkley the morning after the homicide concerning the death of Mrs. Gibson, and each time answered that he remembered something was said, but did not remember what was said; that his memory was not good; and that, "I don't recall just what was stated." Then he was asked, "Now to refresh your recollection, didn't you state at the Police Station shortly after the 27th that at that time you held the flashlight while Dunkley tied Mrs. Gibson?" to which, over objections and colloquies between the court and counsel, the witness was finally permitted to answer, "I may have made the statement." When asked if Mrs. Gibson was tied, he answered, "I am not positive, but it seems like she was." In response to further questions, he answered he saw "a scratch or bruise on the face of the deceased, some bandages on her face"; that he could not state how her hands were tied that they were tied "in back of her"; that when he was in Mrs. Gibson's house he had on rubber gloves but could not say "whether he (Dunkley) had his on or not," nor could he say how Dunkley was dressed that night. After having stated several times that he could not remember what, the morning after the homicide, was said between the witness and Dunkley, the district attorney further asked him if he recalled a conversation "yesterday" between himself, the assistant district attorney, and the police officer, to which the witness answered in the affirmative. Then, "to refresh your recollection, did you not then say what you said to Dunkley was, 'What in hell did you kill her for?'" and over objections the witness was per-

mitted to answer, "No, I don't remember putting it like that." Then he was asked:

"Q. How did you put it, Mr. Regan? A. I might have said, 'Do you think she died from fright?' or something about that way, or 'was she bruised bad enough to die?' I don't recall just what was said, but I don't think it was put in those words.

"Q. You don't think it was put just the way I put it? A. No, sir.

"Q. Do you recall what Dunkley said when you put it the way you said? A. No, sir."

On cross-examination the witness again testified concerning the trouble he had with Mrs. Gibson, over the garnishments, that when the last garnishment was issued he lost his job or was laid off; that before that the railroad company had given him a ticket or transportation to go back to Texas, the trouble he had with the deceased over a receipt for payment of rent, smashing in the glass door, and compelling the deceased to give a receipt as desired by him; that he did not know what money was coming to him when he was laid off; that while living in the house of the deceased he had talks with her about bank failures and understood or had heard that she had taken her money out of the bank and had it somewhere in the house; that he was irritated and "very much nettled" because of the garnishments; that so far as he knew, Dunkley was unacquainted with Mrs. Gibson and knew nothing about her until he told him about the garnishments; that she was miserly and that it was thought she had money in the house; that the first talk he had with Dunkley concerning Mrs. Gibson was a week or two prior the homicide and again talked with him in the morning of the night of the homicide, but what was said between them he could not remember; that on the day and during the night of the homicide he "drank very heavy," was drunk, told the chief of police he was "awful drunk"; that his "mind was hazy as to what took place"; that he used tobacco excessively, smoked a cigarette "about every hour during the night"; that he at times had drank "canned heat," and that when he drank excessively or heavily he

had "illusions"; that a few days before the homicide he and his wife called at the house of one of his former neighbors who came to the door and told him the deceased was in the house and asked him to walk around the block, which he declined to do, entered the house, spoke to the deceased who was in the kitchen, told her to ask him where he lived and not his neighbors, told her if she "was several thousand years younger, I would have my wife kick the ———— out of you," and when the deceased asked the neighbor how she could get out of the house, he told her to go out the back door; that after she left he did not say to the neighbor that, "The old bitch hasn't very many hours to live," but that he "made some remark pertaining to her age, that she wouldn't live long enough, many years more, to be garnishing many more people for rent."

On further cross-examination the witness stated that when he took the witness stand the court admonished him that his testimony would be used against him and that if he testified, "it will be of your own free will and accord." He then was asked:

"Q. Did you ask for your attorney at that time? A. I did.
"Q. Did you confer with him? A. I did.
"Q. What did you say to him?"

That was objected to by the prosecution on the ground that the communication was privileged; that it was incompetent, immaterial, and not proper cross-examination. After considerable colloquies over the matter, the court finally asked counsel for Dunkley, "On what ground do you claim it is competent?" to which counsel replied,

"Well, if I must state my reason, because the attorney made him some promise when he testified.

"The Court: Promise of what?

"Counsel: Promise of a lesser penalty or immunity.

"The Court: I do not see that an attorney could promise that. Objection sustained. The court might do something like that. Objection sustained."

Thereupon the witness was further asked if he did not then see his counsel confer with the district attorney. An objection to that was also sustained. The witness then was asked what his attorney stated to him. An objection to that again was sustained. At that time one of counsel for Dunkley stated he just saw the district attorney shake his head to the witness and that he was prepared to make the statement under oath. "The Court: I do not care to hear from the State." The district attorney, however, stated he was not looking at the witness and "did not shake my head when any question was propounded," and resented the statement of counsel. The witness then was asked by counsel for the defendant whether or not, when the first question by the district attorney was propounded to the witness, "you hesitated until you got a nod of consent from" counsel for the witness. The court, in sustaining an objection to that, observed, "It is a conclusion. The jury is here and sees the conduct of those on the witness stand, and I will not permit this witness to speculate and draw conclusions as to what went on," and stated that the court had theretofore admonished the witness as to his rights and as to what happened, the jury was just as good a judge as the witness, and to permit the witness to state what took place was an encroachment upon the province of the jury. Then the witness was asked, "Do you know what took place between" the district attorney and counsel for the witness? to which the court again sustained an objection. The witness then was asked whether, before he testified, his counsel did not "nod like that" to him (indicating to the witness). An objection to that was also sustained. Then he was asked, "After you received that nod, did you testify?" An objection to that was sustained. Then he was asked, "What punishment do you expect from your testimony here today?" That was objected to as being immaterial. The court, however, stated that he could "state if he expects to be punished for his testimony here today."

The Witness:

"A. Must I answer?"

Counsel for Dunkley:

"Q. Yes. Don't you expect any consideration or any immunity for your testimony here today? A. No, sir.

"Q. Did you talk to Mr. Wire (police officer) and with the Assistant District Attorney" in the county jail? A. I did.

"Q. Did they advise you about this particular question? No, sir.

"Q. Do you expect because of your testimony here today you will receive life imprisonment?"

That was objected to by counsel for the prosecution, but on discussion the objection was withdrawn and the witness answered, "I haven't thought of what my sentence would be when I come up to get it." The witness further was asked and he answered that he had heard a conversation in the county jail between the assistant district attorney, a police officer, and counsel for the witness for a period of probably twenty minutes. Then he was asked if he expected to be tried for first degree murder, and he answered in the affirmative.

The witness further testified concerning his movements after he left the house of the deceased on the night of the homicide, what time he got home, the kind of bandages with which the deceased was tied, and then was asked if the chief of police had not asked him, when he was in the house of the deceased, whether he thought she "was dead or alive," to which the witness replied, "I thought she was just tied, Chief, I didn't think she was dead." He further testified that on the morning after the homicide he told his wife if any one inquired when he got home the evening before "to say about 8:30"; that he told the chief of police and others interrogating him that "it is just kind of dim haze to me about all those movements there" on the night of the homicide; that he was "nervous, excited and sick" when he was interrogated by, and made statements to, the police. He further testified that he, to the chief of police, the district

attorney, his assistant, and to the assistant county attorney, "confessed to this crime," but that he did not, to save his own neck, "throw things onto Dunkley"; and that he did not come into court and testify with any "promise or proposition of immunity."

On redirect examination, in response to questions propounded to him by the district attorney, the witness answered that he did not get home the night of the homicide at 8:30; that he had told the police and district attorney that he, on the night of the homicide, got home at that time, but the statement was false, and that he later stated to the police he got home somewhere between 10 or 11 o'clock. He was further asked if he had not stated to the chief of police that when he went into the house he saw that the hands and the feet of the deceased were bound "to keep them from wiggling and moving" and "to refresh your recollection," if he had not stated to the chief that he saw some blood on the face of the deceased but did not know where it came from and if the chief did not ask him "what Dunkley had hit her with" and that he answered the chief, "With his fist," and then the witness was asked, "Do you recall that answer in substance and effect, and do you recall that being discussed with the Chief? A. I recall something that was discussed." Then he further was asked if, in response to questions asked by the chief, he did not state to him that he saw the deceased lying on her side with her hands tied to her back and that he had not heard any moans or cries or breathing, and then was asked if he recalled such questions and answers to which the witness answered, "Yes, sir. Q. Is that correct? A. Yes, sir." He also was interrogated as to what he stated to the chief of police and others as to what took place and what was said between the witness and Dunkley the morning after the homicide, and, among other things, if he had not told the chief that Dunkley stated, " 'The only damn thing I am afraid of is that pinch bar. When you handed me that I took hold of it and put it in my pocket, that would be the only thing they

could find with my finger prints on it. Maybe they got washed off in the fire.' I said, 'Did you set fire to that house?' and he said, 'Yes.' 'Well,' I said, 'if anything is said tell Johnnie and that girl that I left the place a little before 8:30 or a little before going home.' He said, 'I don't want to get Johnnie mixed up in this.' I said, 'Hell, that won't get him mixed up in it, to say that I left at 8:30,' and I said, 'If anything is said about the pinch bar, you gave it to me over a month ago and I left it in that old house where I moved from,' and he said, 'All right,' and I said, 'Well,' I said, 'we better not be seen here talking' "; and then the witness was asked:

"Do you recall that in substance or effect? Yes, I recall some of it.
"Q. Is that correct? A. Yes, sir."

These and many more questions asked the witness by the district attorney were read from the written confession of the witness, all of which was permitted over the objection of counsel for Dunkley.

On recross-examination the witness further answered that when asked whether Dunkley had hit the deceased, the witness answered, "I didn't ask him." He further answered that when he and Dunkley entered the house and while they were on the first visit that he did not see nor hear the deceased move, nor hear her struggle; that he could not say whether deceased had bandages about her eyes, "It's not clear to my mind. I don't remember whether she did or not."

"Q. Now the reason Mr. Dunkley was to go over to the home and tie her up first was because you were afraid you would be recognized. Isn't that correct? A. That is correct.
"Q. Isn't that so? A. Yes, sir.
"Q. So that preliminary activities over in the Gibson home were because you were afraid she would recognize you. Isn't that correct? A. Yes, sir, that is correct."

Independently of the testimony of Endel, admittedly an accomplice, there is no evidence to connect Dunkley with the commission of the offense unless it be his so-called con-

fession put in evidence by the state. As to that, two points are made; one that it was not sufficiently shown that the confession was made voluntarily; the other that the statements made by him constituting the confession were not sufficient to connect him with the commission of the offense. The homicide was committed on March 27, some time before 12 or 12:30 o'clock midnight. Between the next few days and including the 31st, Dunkley, at the police station, was interrogated at different times, sometimes by the chief of police and other police officers and at other times by police officers when the chief was not present, concerning his knowledge of the homicide and what connection, if any, he had with it, and concerning his whereabouts and movements on the day and night of the 27th. As the result of interrogations on the 31st, he at about 2 o'clock p. m. signed a written statement concerning matters and things inquired about. That statement was not put in evidence nor does the record show its contents. However, thereafter at about 4 o'clock in the afternoon the district attorney, his assistant, and the assistant county attorney in company with one of the official court reporters of the district court appeared at the police station. In their presence and in the presence of the chief of police and other police officers, questions were propounded to Dunkley, mostly by the chief, some by other officers, and some by the assistant district attorney and answers made thereto which were taken in shorthand by the reporter and later transcribed by him. The transcript was unsigned by Dunkley, nor was it at any time submitted to him for correction if any to be made. The reporter was called as a witness by the state, and, upon testifying concerning the circumstances taking the shorthand notes and transcribing them and upon testifying that he had not sufficient independent recollection of the questions asked and answers made thereto to testify concerning them without his notes, but could do so by referring to them and his transcript, was then asked to refer to his notes and transcript and to state the questions propounded to Dunkley and

the answers made by him. The defendant objected to that upon the ground, among other grounds, that it was not shown that the statements made by Dunkley were made voluntarily; and, in connection therewith, the witness was asked if he had any knowledge as to what inducements or promises, etc., were held out or coercion used in the interviews and inquiries had prior to the examination, to which the witness answered that he had no knowledge as to that, but took down what was stated to Dunkley by the chief concerning the voluntariness of his statements just before the examination commenced. Counsel for the defendant insisted that the state was required to call the chief of police and the officers interviewing and interrogating Dunkley at the prior interviews to ascertain from them what, if any, promises were made or coercion used to obtain statements made by Dunkley and requested a hearing before the court on voir dire.

Thereupon the jury was excused and a hearing on voir dire had before the court respecting the voluntariness of the statements made by Dunkley. The state by the reporter showed that just before the examination commenced, the chief of police stated to Dunkley, which was taken down by the reporter, that it was his duty to inform him the purpose

"of this interrogation, to tell you that you have a constitutional right, as an American citizen, and that any and all statements made by you can and probably will be used against you. With this in mind are you willing to make a statement of your own free will and choice with the knowledge that it is made without any promise of reward or any threat or coercion in any manner or form whatever."

To which Dunkley answered, "Yes, sir." As to the question of voluntariness, the state showed no more. Counsel for defendant urged that the state be required to call the chief of police and other officers who previously and at different times had interviewed and interrogated him and to show what, if any, promises were made or coercion used to influence or induce statements by the accused. The court refused the request, stating that if any such promises were

made or coercion used, counsel for the defendant could show it by calling the defendant himself. Counsel for the defendant called one of the police officers, who on the day of the examination and prior thereto and on other days had interviewed and interrogated the defendant; but not anything was disclosed by his testimony to show that any promise or threat was made or coercion used, and, on the contrary, the officer in effect testified that no influence or inducement was employed to cause Dunkley to make any statement, other than he chose to make freely in response to questions asked him. The defendant also was called. Not anything was testified to by him that the police promised him anything or threatened or coerced him or in any particular treated him harshly or unfairly. About the only conflict in the evidence respecting the matter is as to whether Dunkley at his request was given opportunity to see an attorney whom he had requested to see. The defendant testified that at about 2 o'clock p. m. on the day of the examination which was commenced at about 4 o'clock p. m., he asked to see an attorney designated by him and who later was one of counsel in the case, and that the chief of police stated, "For Christ's sake, call him a lawyer," and that one of the officers left the room, shortly came back stating that the attorney requested was in court and that they could not get him. The police officer called by the defendant denied that the chief made such a statement, but testified that at Dunkley's request he saw the attorney in an outer room and "I told him I would tell him and I did tell him," and that he had not stated to Dunkley that he was unable to communicate with the attorney because he was in court. The attorney testified that he was at the police station at 2 o'clock and asked the officer to see Dunkley, that the officer told him they were talking with him and that when they got through he could see him and told the attorney to come back at about 3 o'clock. The attorney went back at 3 o'clock, but, as he testified, was not permitted to see Dunkley until about 6 o'clock and not until after the examination was had and

completed. In response to a question from the court propounded to Dunkley, "Did the police ever tell you that you could not have an·attorney?" Dunkley answered, "They never said I couldn't, but they never gave me one when I asked for one and never advised me that there had been one there to see me." Dunkley further testified that at the time of the taking of the examination he did not then ask for an attorney but several hours before when the chief and several officers started to interrogate him he asked to see the attorney designated by him, that one of the officers went out and came back and stated that the attorney was in court and that they could not get him.

It is not made to appear that Dunkley at any time refused to be interviewed or to answer any questions before he had opportunity to consult with counsel, nor is it made to appear that he was required or urged, much less compelled, to do so, and so far as made to appear the examination was taken fairly, the questions propounded properly stated without any effort or employment to confuse or "entangle" the accused, or to argue with him during the examination, and that he was given every opportunity to answer the questions propounded freely and as fully as he desired.

The court thereupon called the jury back, overruled the objection, and permitted the reporter from the transcript of his notes to state or read to the jury the questions propounded to Dunkley and the answers made by him thereto. The reporter, however, first read to the jury the statement of the chief of police heretofore referred to made to Dunkley before the examination began. No other evidence respecting the question of voluntariness was adduced before the jury.

So far as here material, the substance of the examination by questions and answers is: He resided in Salt Lake, by occupation was a fruit packer, had known Endel or Regan about a year, had furnished him whisky for a consideration, and that the first discussion they had concerning Mrs. Gibson was in February, 1933. Endel said, "This woman (Mrs.

Gibson) had a lot of money and was an old woman. That she had garnished him, that she was a miser. That is all that was said, something about sometime when she was out, away from home, to steal it." No other conversation was had with Endel concerning Mrs. Gibson until the 27th of March. On that day Endel at about 11 to 12 o'clock in the forenoon or around there, came over to Dunkley's place, bought a bottle of whisky and had a few drinks, and stated that "the old bitch had garnished him again and said, 'We ought to go over,' we got to talking about it. He went up town and bought some gloves and came back and had a few more drinks. We made it up, I was to go over and tie her up and I was to meet him at 7:00 o'clock on the corner of 7th South and West Temple Streets," near where Mrs. Gibson resided. "I went over to her house. When I got over there I knocked at the door and she came out. It was about 6:30 o'clock and just getting dusk. I just could not do it. So I talked to her about the rental of her house. We walked out and stood on the street for fifteen or twenty minutes, maybe a half hour, talking with her, talking about different things, about her house and cleaning it up and one thing and another"; that he then departed—it was then dark—and "went up to the corner and Regan (Engel) was waiting there. I told him this woman would not answer the door. He had a bottle in his pocket. He had just come from my place. He stopped over there and had a couple of drinks and a bottle in his pocket and we walked down to the next corner and walked around and had a drink. We came back around there and there was a couple of girls coming along" and so they walked up the street, "and I just said (to Endel) 'I am not going through with it.' He said, 'You ought to know your guts and figure it out before you go on a job.' We quarreled about it and I said, 'To hell with you,' and left. That was the last I seen of Regan (Endel) until the next morning."

He further stated he left Endel about 8 o'clock or between 8 and 9 and went to his Dunkley's, house, remained

there fifteen or twenty minutes, and then went up town and stated concerning his movements and whereabouts thereafter. He further stated that in the afternoon Endel gave him a pair of rubber gloves and a roll of adhesive tape to tie up Mrs. Gibson. He was asked, "What was your purpose of going down and seeing Mrs. Gibson in the first place? A. To tie her up." He further stated that when he returned to Endel he gave Endel the tape that was given him and threw the gloves away. He further stated that when he went over to Mrs. Gibson's place he took a flashlight along with him which he had borrowed from a neighbor, for the reason Endel told him that there were no lights in the house and that he would have to take a flash-light with him. He further stated he did not use the flash-light, that he was not then, nor at any other time, in Mrs. Gibson's house, and that, "Q. You were never inside of Mrs. Gibson's house at all? A. No, sir. Q. At any time? A. No, sir," and denied having any connection with the robbery or of tying up Mrs. Gibson or that he had anything to do with the homicide; but stated that he had agreed with Endel to go to her house and tie her up, and "we were going to ransack the house for money," but when he went down and saw Mrs. Gibson, he abandoned the idea, in no way molested her, and went back and told Endel, who was waiting for him, that he would not go through with the job, and then left Endel, did not go back to Mrs. Gibson's place and saw no more of Endel until the next morning when he came over to his place, knocked at his door, rushed to the toilet, and when he came out had a drink; that he was only there about five or ten minutes and said, "Mrs. Gibson had been robbed the night before and that you and Johnnie and Johnnie's girl say (who were at Dunkley's place the evening of the 27th) that I was here until 8:30 last night," and that Dunkley told him not to "mix Johnnie's girl's name into it"; and that he had not again seen Endel until he saw him in jail. He also was asked if Endel had not also given him a small pinch bar and stated Endel showed him one, the sharp point on it, that

he had it in his hand and looked at it, but did not take or possess it and handed it back to Endel.

Without further evidence to connect the accused with the commission of the homicide or of the robbery, the state rested. It is unnecessary to go into the evidence adduced on behalf of the defendant as to his whereabouts on the night of the homicide after he left Endel at which time it is shown, by undisputed evidence, Mrs. Gibson was alive and unharmed.

As already observed, the body of the deceased was discovered at about 12:30 a. m., at which time it was not yet rigid, still somewhat warm, and as it was carried out the arms and limbs limp. Both parties called physicians who testified concerning the length of time after death rigor mortis may be expected. They somewhat differed as to the time, depending upon conditions and the cause of death, most of them admitting that when death was from disease rigor mortis would not as soon be manifest as when the cause of death was from violence and injury. Some of them testified that when the cause of death was from violence or injury inflicted, rigor mortis might be manifested within half an hour, others put it within an hour or several hours, dependent upon conditions. At any rate, from the facts and circumstances in evidence and the nature of the wounds and injuries inflicted such as to cause almost immediate death, it is quite apparent the death was not caused until about or shortly before midnight; and between 9 o'clock and after midnight evidence was adduced to show that Dunkley was at a place or places other than at or about the premises of the deceased, and no evidence to show that he was at her place later than 7 or 7:30 o'clock after which time she was seen alive and unharmed, except the testimony of Endel who testified that he and Dunkley entered the house between 7:45 and 8 o'clock, found the deceased tied and bound lying on the floor and between 8:30 and 9 o'clock discovering that she moved her body, as he testified, they left the house, Endel to get more tape, and Dunkley to replenish

the flash-light; that they returned in about fifteen or twenty minutes, Endel holding the flash-light while Dunkley retied her, and, after searching the premises for a half hour or more to find money, and finding none, departed, leaving the deceased bound and tied lying on the floor; that he noticed a little blood on her nose or face, did not know whether she was conscious or unconscious, but did not think she was dead; and testified to no wounds whatever on or about her face, head, or body or as to any condition which could or might cause death. In other words, according to his testimony the deceased was alive, with no wounds or injuries which might or could cause death when they at about 10 o'clock left the house and premises of the deceased and no injuries whatever inflicted upon her while they were in the house.

Now as to the admissibility of the so-called confession. Upon objections made, the burden, of course, was upon the state to first show that the confession was the voluntary statement of the accused, without any promise of reward or immunity or threat or coercion. The rule in such particular and as to the procedure to be followed in making a prima facie showing of voluntariness by the state before admitting the confession, and the function which the court and the jury perform in the matter, is stated in *State* v. *Wells*, 35 Utah 400, 100 P. 681, 136 Am. St. Rep. 1059, 19 Ann. Cas. 631. Such preliminary matter and prima facie showing was heard, as it could be, before the court in the absence of the jury. At the conclusion of such hearing, the court ruled that a sufficient prima facie showing was made to admit the so-called confession in evidence. We think no error was committed in such particular. The court by its charge later submitted the question of voluntariness to the jury with the direction that if they found the confession was not voluntary, etc., to exclude it and not consider it, but if they found it was made voluntarily, to give such weight to it as they thought it entitled to. But all the evidence heard before the court in the absence of the jury

on the question of voluntariness was not put before the jury. All that was put before them was the statement of the chief of police to the accused just before the examination taken by the reporter began. But on the record we do not find that counsel for the defendant offered to bring such evidence or any other evidence before the jury bearing on the question of voluntariness or involuntariness of the confession. The procedure in such respect is indicated in the Wells Case. At the hearing before the court, there was an element, more or less bearing on the question, relating to the subject of whether the accused at his request was given opportunity of counsel at the various interviews had with him before the examination was had and taken. According to the claim of the accused, he had requested to see and consult with counsel designated by him and that the police reported to him they were unable to get in touch with such counsel, and, according to the testimony of counsel, he was not permitted to see the accused until after the examination was had and completed. All that, in effect, was denied by the state. The matter, for what it is worth, ought to have been put before the jury. But since the defendant did not offer to do so, nor offer any evidence before the jury bearing on the question of voluntariness, we think the defendant is not in position to complain. We thus are of the opinion that a sufficient prima facie showing of voluntariness was made to admit the confession in evidence.

The next and the most important question is whether the so-called confession was sufficient to connect the accused with the commission of the charged offense, the killing of the deceased by striking and beating her with a blunt instrument and choking and strangling her, thereby inflicting mortal wounds and injuries upon her from which she died. The defendant urges that the statements admitted in evidence were admitted as a confession; the state, that they were admitted as admissions, the state urging that to be a confession the statement must be an acknowledgment of guilt of the offense charged, an admission of every element

necessary to establish the crime charged (except the corpus deliciti), and that an admission is much less than a confession, an acknowledgment of some material fact or circumstance in and of itself insufficient to authorize a conviction. Many cases are cited by the state to that effect, notably *State* v. *Guie,* 56 Mont. 485, 186 P. 329; *Beasley* v. *State,* 28 Ga. App. 564, 112 S. E. 168; *State* v. *Cook,* 188 Iowa 655, 176 N. W. 674; *Commonwealth* v. *Haywood,* 247 Mass. 16, 141 N. E. 571; *People* v. *Ferdinand,* 194 Cal. 555, 229 P. 341. Such seems to be the general trend of authorities. 16 C. J. 715, and cases there cited. That, too, seems to be the holding in *State* v. *Sheffield,* 45 Utah 426, 146 P. 306.

It here matters not so much what name may be given the statement, whether a confession or an admission. The question here is whether regarded as the one or the other, are the statements, independently of the testimony of the accomplice, sufficient to connect the accused ■ with the commission of the charged offense? The rule in such respect is, where the statement contains both disserving and self-serving statements, the whole must be admitted and considered by the jury. It was here so admitted and required to be so considered. In such case, the general rule is as stated in 22 C. J. 415:

"When an entire statement is admitted in evidence, the self-serving part of it must be duly considered and weighed together with the unfavorable part. But all parts of the statement are not necessarily to be regarded as worthy of equal credit. The triers of fact may reject such portions, if any, as appear to be inconsistent, improbable, or rebutted by other circumstances in evidence; but they are not at liberty to disbelieve the self-serving part capriciously and without any reasonable grounds; and it has been said that they cannot believe part and disbelieve another part unless such parts are distinct and relate to different matters or facts."

Many cases are there cited in support thereof. So, too, in 3 Jones' Comm. on Evid. (2d Ed.) § 1063. To that effect is *State* v. *Romeo,* 42 Utah 46, 128 P. 530. In an early de-

cision in Massachusettts, *Whitwell* v. *Wyer*, 11 Mass. 6, the court said:

"Where you rely upon a confession, you must take it all together."

And in Vermont, *Mattocks* v. *Lyman*, 18 Vt. 98, 46 Am. Dec. 138, it is said:

"That the whole declaration of the party, made at one time, as well that in his favor, as that which is against him, must be received and weighed."

In Jones' Comm. on Evid., supra, it further is said:

"Where, taking the confession together, the branch making against the party is completely avoided, qualified or explained away by another branch, and there is nothing beside, either intrinsic or extrinsic, the latter branch to render it questionable, the first is neutralized; and the whole is considered by the cases as not weighing a feather against the party."

Further says the author, that a statement that the proofs presented were sufficient to show the death of the insured, but that they show the insured had committed suicide, the whole admission must be taken toether; and, if sufficient to establish the death, it is also sufficient to show the manner of death.

In view of all this, how stands the case? Certainly the court could not properly have admitted in evidence only the disserving statements by excluding the self-serving, and, when both were admitted, the jury could not be permitted to do what the court could not have done, consider only the disserving and reject the self-serving, or to believe the disserving and disbelieve the self-serving, unless there is something either instrinsic or extrinsic to render the self-serving questionable or doubtful or inconsistent.

The disserving statements here are that it was talked over, agreed, between Endel and the accused that the latter with gloves (to avoid detection of fingerprints), tape, and bandages, furnished him by the former, was to go to the deceased's premises and there tie and bandage her for the purpose of ransacking the house for money and that the accused went to the deceased's premises for such purpose;

but coupled or correlated therewith and as a part of the same statements are self-serving statements, that when the accused arrived at the deceased's premises, he knocked at the door and when she came out he lost heart—"I just couldn't do it"—abandoned the enterprise, left the deceased unharmed, went to the corner of the street where Endel by appointment was waiting for him, and told him he would not have anything more to do with the matter, whereupon they parted, the accused seeing nothing more of Endel until the next morning.

Let it be conceded, for such is the rule, that the jury were not required to give as much weight to the self-serving statements as to the disserving, yet, it is also true that before the jury could properly reject or disbelieve the self-serving, it was necessary that something be made to appear, either intrinsic or extrinsic, to render the self-serving statements questionable, doubtful, or inconsistent. In other words, the jury could not be permitted to arbitrarily or capriciously reject or disbelieve them. When the intrinsic or extrinsic facts and circumstances are resorted to and considered, not anything is made to appear inconsistent with the self-serving statements. Testimony was given to show that at the time the accused stated he was at the deceased's premises, some one was there talking with the deceased; that they visited one of the apartments which the deceased had to let; that afterwards they stood outside on or near the street talking for some time after which the visitor departed and after that the evidence is undisputed the deceased was alive, unharmed, and about her premises; that there is no evidence, except that of the accomplice, that the accused after he left Endel was seen at or about the premises of the deceased, and, on the contrary, evidence to show that he from thence on and until after midnight was at another place or places; that according to the testimony of the accomplice, after he and the accused had ransacked the house and found no money, they left the premises while the deceased tied and bound was still lying on

the floor with no wounds or injuries inflicted upon her by either of them; that when the deceased was discovered, neither her hands nor feet were bound and no tape or bandages about her face or body; that the wounds and injuries inflicted upon the deceased causing her death and setting fire to the premises were acts of a fiend with deep-seated revenge; that no such or any motive on the part of the accused was shown; that the infliction of the wounds and injuries point strongly, if not unmistakably, to Endel (he confessed it) who was angered because of the garnishments and losing his employment, who confessedly was addicted to an excessive use of strong drink, at times suffering from illusions, and who on the night in question was so drunk as not to remember what all took place and "hazy" as to what did take place, none of which facts or circumstances being inconsistent with the self-serving statements of the accused.

Thus, by his statement to connect the accused with the commission of the offense, if at all, necessitates a consideration alone of the statement that he had entered into an agreement with Endel to tie and bandage the deceased for the purpose of ransacking the house for money and to reject the self-serving statements. Further, though the disserving statements that the accused had agreed to tie and bandage the deceased for the purpose stated be so considered, yet they would not be sufficient to connect him with the commission of the offense, when indisputably shown, as it was that the deceased when discovered was not tied or bound and the act agreed to be done not done.

As heretofore shown, over the objections of the defendant a number of questions to refresh the recollection of witness Endel, both on direct and redirect examination, were asked by the district attorney as to what he had said or stated to the chief of police, at other times to the assistant district attorney and to a police officer, concerning matters and things testified to by him. The district attorney made no claim that he was taken by surprise by answers made by the witness nor had the wit-

ness testified to anything which tended to exonerate Dunkley. All that may be said, as shown by the record, is that the answers made by the witness to questions propounded to him were not as full or in manner as expected by the district attorney, the witness as to some of the questions answering that he did not remember or did not recall, or did not fully answer matters and things concerning which inquiry was made or as was expected by the district attorney. But he made no claim of surprise even as to that, and without doing so proceeded to interrogate the witness if he had not stated to the chief and other police officers or to the assistant district attorney concerning matters and things, as heretofore referred to and as shown by the record a number of other similar matters, some of them in addition to what was testified to by the witness and some which the witness answered he did not remember or recollect. We think prejudicial error was committed in such respect. *State* v. *Leek* (Utah) 39 P. (2d) 1091; *State* v. *Treseder,* 66 Utah 543, 244 P. 654 (to which special reference is made to the case as reported in the Pacific Reporter because of misprints in some of the Utah Reports).

Endel made and signed a written confession of guilt. On cross-examination counsel for the defendant called his attention to statements contained therein. On redirect, the district attorney also called attention thereto. So far as such matters to which the district attorney called attention related to, or tended to modify or explain the statements to which counsel for the defendant had called attention, they were proper enough and within the rules of evidence. But the district attorney did more than that. He referred to and called attention to matters and things contained in the written confession which did not tend to modify or explain nor relate to the statements to which counsel for the defendant referred. Permitting the district attorney to do so over the objection of the defendant also was prejudicial error. We also are of the opinion that error was committed in restricting the cross-examination

of Endel as was done and as heretofore set forth, and in not permitting inquiry as to what if anything was communicated or stated to him by his counsel representing him at the trial, with respect to a promise of immunity or lesser penalty, and as to whether the witness had not hesitated to answer until his counsel "nodded" to him. Among the objections made by the state was the objection that the communication was privileged, that the attorney had no authority to make any such promise, and whether the attorney had or had not "nodded" to the witness was something equally obvious to the jury as to the witness and to permit him to answer was to invade the province of the jury. We think the objections untenable. If, because of the relation of attorney and client, the communication inquired about was privileged, the witness, or his attorney for him, could have claimed the privilege, but neither did so. The state could not nor could the district attorney claim or urge it. 5 Jones' Comm. on Evid. (2d Ed.) § 2157. Certainly counsel for the witness could not with the district attorney or otherwise enter into an agreement or procure or make a promise of immunity or of a lesser penalty binding on the court. But that is not the point; nor was the inquiry sought for such purpose. It was sought to show the state of mind of the witness and as affecting his credibility and the weight to be given his testimony and for such purpose the inquiry was both competent and proper. That was expressly held in the case of *State* v. *Barretta*, 47 Utah 479, 155 P. 343, where the matter is rather elaborately considered and the doctrine with respect thereto approved as stated in the case of *State* v. *Kent*, 4 N. D. 577, 62 N. W. 631, 27 L. R. A. 686. So, too, for the same reason and purpose was it competent to inquire what, if any, aid during the trial counsel for the witness rendered the prosecution and what, if any, signals were given by him to the witness in the course of his examination as a witness.

Lastly, on the motion for a new trial, the defendant, among other grounds, based the motion on the ground of

newly discovered evidence and in support thereof was permitted to present and file an affidavit of Endel and of others. It here is to be noted that the time for Endel to plead to the information was extended, and, when he pleaded not guilty, the time of trial also was extended from time to time and again extended after the verdict of the jury was rendered in the Dunkley case. After the verdict was rendered finding Dunkley guilty of murder in the second degree and a motion for a new trial made by him, but before it was determined, the district attorney, under the information in the Endel case, reduced the charge to murder in the second degree to which Endel pleaded guilty and was sentenced to the state prison for forty years, the same sentence which was imposed upon Dunkley. Thereafter, in support of his motion for a new trial, the defendant presented and filed an affidavit of Endel wherein he, among other things, deposed that he made the affidavit of his own free will and for the purpose of clearing his conscience and to rectify a grievous wrong done against Dunkley; that at the time of his arrest he was told that he would be "backed up against the wall and shot"; that at the same time his wife was held in jail and he was in a high state of nervousness and anxiety and worried over the welfare of his wife and of his own; that the statements he made to the police at the police station are true and correct up to the point where he said he met Dunkley at the corner of the street at about 7:45 p. m. on the evening of March 27, 1933; that he and Dunkley quarreled between the hours of 8 and 9 p. m. and that Dunkley handed back the tape and left the affiant; that he did not know where Dunkley went and that Dunkley did not accompany affiant to the home of Mrs. Gibson and "neither did Dunkley participate in any way whatever in the robbery that was planned by this affiant and Dunkley"; that after Dunkley left him the affiant "drank a pint of whiskey and after that his mind was not clear as to what happened"; that he was sure "he never saw Dunkley again that night"; that he saw him the next

morning and that he told Dunkley to say that affiant was at Dunkley's place until 8:30 p. m. on the evening of March 27, 1933, should any one inquire about affiant; that "while Dunkley has been done a great wrong, yet when one's life is at stake it is hard to say what one will do under the same or similar circumstances"; that Dunkley "is innocent of the crime for which he has been convicted and that he, affiant, takes all the blame and realizes that in taking all of the responsibility for such a crime he will greatly lessen his chances to again gain his freedom; * * * that the making of this statement is the only honorable thing to do; that said Dunkley did help plan the robbery but that he, Dunkley, did not go through with it as Mr. Dunkley stated in his statement; * * * that affiant has had time to reflect and think the matter over and that he makes this statement for the sake of justice and hopes it is not too late to acquit Dunkley of the crime of which he is charged and of which he is not guilty"; and "that this statement is true and correct and all former statements in conflict herewith are false and untrue."

Affidavits were made by two other persons to whom Endel, after his sentence, made statements similar to those contained in the affidavit of Endel.

The motion for a new trial was overruled. We think prejudicial error was committed in so doing. In view that the state to convict Dunkley was required to depend upon the testimony of Endel and without which no conviction could be had of Dunkley; of the rather unsatisfactory testimony of Endel as adduced at the trial; his self-admitted condition of inebriety during the night of the homicide to such an extent as to be unable to remember or recall much that then took place; at times suffering from illusions; himself having fully confessed his guilt; himself the principal witness for the state; the affidavit of Endel in no particular assailed by the state or as having been procured under or through undue or improper influence, threat, coercion, or by or through any effort, other than his own free will,

it is fairly and reasonably probable that on a new trial with the aid of the newly discovered evidence a different result might be obtained. We thus think a new trial should have been granted on the ground stated.

Thus, for that and also for other reasons stated, the judgment of the lower court is reversed and a new trial granted.

ELIAS HANSEN, EPHRAIM HANSON, and MOFFAT, JJ., concur.

FOLLAND, Justice.

I concur in the opinion and the results, except I do not concur in the holding that the admission of the appellant is valueless as corroboration of the accomplice Endel. In his admission appellant states he and Endel planned and prepared for the robbery of Mrs. Gibson, and that he started on the enterprise. This, I think, tends to connect him with the commission of the offense and to that extent corroborates the testimony of the accomplice. All the statute (Rev. St. 1933, 105-32-18) requires is evidence, independent of the testimony of the accomplice, which "tends to connect the defendant with the commission of the offense." I do not believe the corroborative effect of this admissison is destroyed because the appellant, in his statement, went further and said that he, after starting on the enterprise, abandoned the project and notified Endel he would have nothing more to do with it. Even though the statement that he abandoned the project before its perpetration be taken at face value, yet his association with Endel in planning and preparing for the robbery is an admitted fact which tends to connect him with the commission of the offense.

The law is that both the disserving and self-serving statements must be admitted and considered together, although all parts are not necessarily to be regarded as worthy of equal credit. *State* v. *Romeo*, 42 Utah 46, 128 P. 530. The self-serving portion of the admission is not so free from inconsistency or improbability as to permit the court, as matter of law, to hold it cancels and makes for naught the

disserving portion of the statement which connects appellant with the enterprise. There are facts and circumstances in evidence which are entitled to consideration as bearing on the question of whether his statement of abandonment is true. The following will illustrate: Appellant returned to his home for fifteen or twenty minutes at about 9 o'clock on the night of the homicide, which the accomplice said was for the purpose of obtaining another battery for a flashlight; appellant had a flash-light which he borrowed for the purpose of aiding in ransacking the Gibson house, but he said he kept it in his own possession all the evening and did not use it in the Gibson home, nor did he let Endel have it, yet a flash-light was undoubtedly used in ransacking the home. Appellant's explanation of his whereabouts between 9 p. m. and midnight was not satisfactory. Some of the wounds on the face of the deceased appeared to have been made with a fist. When appellant was examined at police station, his kunckels were skinned and he had black and blue spots on his finger. When asked how he received these injuries, he first said, "I don't know," but later told of a fight with two boys a few days before and said his injuries were received in that fight.

Having corroborated the accomplice so far as his connection with the robbery enterprise at its inception is concerned, it was for the jury to determine from all the evidence, including appellant's statements of abandonment, whether or not he was actually guilty of the offense charged.